CLARK, C. J., dissenting arguendo; HOKE, J., concurring in the dissenting opinion.
This action is brought by the plaintiff against the defendants, the Southern Railway Company and Dwight W. Newell, a trainmaster of defendant company, for the negligent killing of Claude C. Dermid, a freight conductor in the employ of said company. The court submitted certain issues involving the negligence of the defendants, the contributory negligence of the plaintiff's intestate, and damage.
At the close of plaintiff's testimony the defendants moved to nonsuit, under the Hinsdale Act, and offered no evidence. Upon an intimation of the court that he would charge the jury that, if they found the facts to be as testified to by the plaintiff's witnesses, they should answer the first issue "No," the plaintiff submitted to a nonsuit and appealed.
We will regard the intimation of his Honor as tantamount to sustaining the motion to nonsuit, and taking all the evidence in the most favorable light for the plaintiff, we are of opinion that she is not entitled to recover.
1. Because her intestate, upon her own showing, was guilty of such contributory negligence as bars recovery.
2. Because there is no sufficient evidence of negligence.
There were only five witnesses examined — the plaintiff herself, *Page 136 
Patton, Moody, Bryant and Barkley. The evidence of the first two throws no light whatever upon the two material issues involved. The evidence of all tends to prove these facts: The plaintiff's intestate was killed on the Balsam Mountain section of defendant company's road, on 16 January, 1906, by being crushed between two cars of a freight train of which he was conductor. In order to get his train up Balsam Mountain the conductor had to take it up in sections. When he had gotten it all up to the top it became necessary to couple up the entire train again. (182) It was fully equipped with automatic couplers and air brakes. The intestate give an order to the engineer to detach his engine from the cars and to bring up the caboose and attach it to the end of the train. In order to uncouple, it was necessary to back the engine so that the "slack" would be shortened, thereby loosening the coupling pin holding the coupling of the engine and the car to which it was fastened, so that it could be removed, thus detaching the engine. At the time he gave his order the intestate was standing close by the side of the train and immediately opposite the opening between two parts of the train. He went in between the cars at once, upon giving the order, to couple together the air brake hose under the cars and to turn on the air cock underneath the car couplings. When the engine was backed so as to shorten slack and detach the engine, in obedience to the conductor's order, he was caught between the bumpers of the cars and crushed in the chest and killed. The plaintiff's intestate had been for three or four years a brakeman for the defendant company, and after that had served for about two years as freight conductor. He knew all about the operation of freight trains, and that, to obey the order given to the engineer, the latter must "give slack" to permit the coupling pin to be removed, and that the effect of this must be to push the two cars together. Nevertheless, the intestate at once, upon giving the order, walked between the cars and was crushed. The plaintiff's witness themselves characterize such conduct as dangerous. The facts show that the intestate must have seen the bumpers and must have known the effect of "giving slack." The witness Moody testifies to hearing the rumbling noise of the cars as they came back together just before the intestate was hurt. All the witnesses testify that it was the air brakeman's duty to couple the air hose, and that there is a safe and usual method of doing it, which should have been followed by the intestate. This safe and usual method (183) is testified to very clearly by the witness Moody, a brakeman: "Question. I wish you would tell how that operation of the making of the coupling of the air hose, the turning of the air cock, should be done in the safest way, under the rules of the company. Do you know?
"Answer. Yes. *Page 137 
"Q. Tell how. "A. If a man wants to couple the air hose and be safe, he wants to get down and reach under the dead blocks. "Q. And that is the rule required by the company? "A. That is the way I always did it. "Q. And were required to do it? "A. Yes."
The evidence shows that it was not the conductor's duty to couple air hose, but that of the air brakeman, and it must follow that if he voluntarily undertook to perform that duty he should have done it in the recognized safe method. He had been a brakeman and conductor of long experience and knew how such work was usually done. It was his duty to follow the safe method in general use, and not to walk in between cars that his knowledge and experience told him must soon come together.
The intestate not only chose to unnecessarily encounter an obvious danger, but he selected a method of doing the work known to him to be dangerous, when he could have performed the same act with reasonable safety by following the known method usual among brakemen. That the conduct of the intestate is such negligence as bars recovery for damages sustained in consequence of it is held by the great weight of authority. Whitson v.Wrenn, 134 N.C. 86, and cases cited; Elmore v. R. R., 132 N.C. 867.
The principle of law applicable here is well stated in Covingtonv. Furniture Co., 138 N.C. 378, "that where there is a safe and a dangerous method available for the performance of the work in hand, and the servant selects the latter with actual knowledge of the fact that it is dangerous, he cannot recover." To same effect (184) is Horne v. Power Co., 141 N.C. 50.
The intestate was not killed because the cars were not equipped with automatic couplers of the latest and most approved devices, and therefore there can be no application of the principle enunciated in the Troxler andGreenlee cases.
We also agree with his Honor that there is no evidence of negligence upon the part of the defendant company, much less upon the part of defendant Newell, the trainmaster.
The engineer was not negligent. He only obeyed the command of the conductor. He was not required to anticipate that the conductor would go outside of his duty and walk into a place of great danger at the very moment the engineer was proceeding to execute his order.
There is no evidence that the cars or any part of them were out of repair in any respect which caused the injury, or that the company's trainmen were either incompetent or insufficient. *Page 138 
The evidence is wholly insufficient to warrant a finding of negligence because the cars had bumpers on them. It is not a question for the jurors as to whether bumpers are useless and should be removed. They are not experts in car construction or railroading. The evidence tends to prove that at the time the intestate was killed bumpers were in general use, especially on all old cars and on railroads generally. There is evidence also that many new cars are constructed with bumpers, but of a new and different pattern and construction.
Why cars should have bumpers on them, and their use and purpose, are not disclosed, but as is said by Moody, one of plaintiff's witnesses, "I suppose bumpers were considered of use or they would not have been left on." The same witness testified that they are in general use and continue in general use after the adoption of the automatic coupler.
The witness Bryant testified that from 25 to 50 per cent of (185) freight cars have bumpers on them, that they are visible to a person going between the cars, and that he could not say that in January, 1906, he ever saw a car with bumpers removed.
The witness Barkley, a car inspector, testified:
"Q. To what extent, if you know, have these dead bumpers been in use since the automatic couplers were used?
"A. Not so much. The majority of cars that are being built now are built without them."
Taking the entire evidence offered into review, we think it fails to disclose anything that tends to prove the failure to discharge any duty which either defendant owed to the plaintiff's intestate.
The view we take of the case renders it unnecessary to consider the other exceptions in the record.
Affirmed.