Civil action to recover damages for wrongful death.
One phase of the controversy involved on this appeal was here on a former appeal. Hayes v. Elon College, 224 N.C. 11. Many of the facts are there stated. At the risk of repetition we add the following, gleaned from plaintiff's evidence, as being material here:
A part of defendant's local electric light system — six poles and wires attached thereto — was, as alleged by plaintiff, in a dangerous and defective condition. The deceased and his associates, Grimes Moore and Joe Dixon, were engaged to make the necessary repairs thereto. They were to replace six old poles with new poles and transfer the five wires from the old poles to the new poles.
Three of the wires carried 2,300 volts of electric current each and two carried 110 volts each. All the wires were strung on cross arms *Page 435 
until they reached the fourth pole. There one dropped below the cross arms and was strung on house brackets attached to the poles for the distance of two poles and was then again raised to and strung on the cross arms.
At the time deceased and his associates contracted to do the work they knew that three of the wires were high tension and two were light circuit wires, but they did not know which were high tension and which were low voltage. Defendant failed to advise or warn them in respect thereto.
If a person is standing on wet ground and comes in contact with live electric current the current becomes more violent and dangerous and if a person is standing on wet ground and comes in contact with 110 volts with no insulation he may suffer death therefrom, though it is possible to release him from the wire before it becomes fatal.
When working on live wires skilled linemen usually use rubber equipment, rubber gloves, insulated hooks and snakes which furnish protection from electricity up to 10,000 volts, and deceased had rubber gloves available at the time of the accident which caused his death.
The customary practice prevailing as to "electric power lines" governing the installation and maintenance of electric transmission wires requires that a wire installed and maintained upon house brackets located below the cross arms carry only 110 volts of current, but witnesses for plaintiff were not advised whether such practice prevailed for local plants such as that of defendant. However, a skilled electrician, seeing wires strung on house brackets, would believe and conclude that they were low voltage wires. He could not determine how much current a wire carried by merely looking at it.
When deceased and his associates reported on the premises of defendant to begin the work they had a conversation with a Mr. Lovett, agent of the defendant.
"Mr. Lovett stayed and talked a little and then went back to the office, but we had a conversation about cutting off the current when we first got there. I do not remember whether I asked or Mr. Hayes asked. Mr. Lovett said that we could have it off but that he would like for us to keep it on as long as we possibly could on account of the heating and cooking, and Mr. Hayes and I decided to set the poles before we cut off the current, and Mr. Lovett did not have anything to do with that. He just said leave it on as long as possible for heating. . . . He told us who to see to cut it off, a man who worked there. . . . We were both experienced linemen and we knew the current was on those lines." After Mr. Lovett had gone back into the building, deceased and his associates decided to set the poles before they cut off the current. *Page 436 
The contractors proceeded to set the poles without transferring the wires until they came to the fifth pole. "Mr. Hayes said we could go ahead and put the poles in the holes and come back and tamp them and then cut off the current; that it would be safer . . ." When they came to the fifth pole they found it was necessary to detach the wire hung on house brackets on the fourth and fifth poles in order to set the fifth pole properly. Moore went to get his climbers and safety belt so as to climb the pole and detach the wires. He relates what happened thereafter as follows:
"Well, I came back (from the car) and asked Mr. Hayes if he knew what was on that wire and he said he did not think there was anything and to wait and he would look, and he walked down another span and hollered back and said he thought that was a control wire going into the kitchen and for me to go ahead and throw it down and I untied it on that pole and let down the telephone — and let it down and then these two. . . . We had not tested it out then and could not tell whether the wire dropping down had 2,300 volts. . . . We had not looked and still could not tell which carried the 2,300 volts, and we had not looked when we came to the fifth pole. . . . The only thing I did was ask Mr. Hayes about taking the line down, and he said to take it down, that it was a control line, when, if he had walked on nearer, he would have seen that it was 2,300 on that wire that I asked Mr. Hayes about. . . . We both had out gloves with us. We were not going to unhitch the wires until we had all the poles set and that is the reason we did not carry the gloves out there. We both had pairs of rubber gloves in the automobile . . . the reason Mr. Hayes and I did not take our gloves out of the car was that we had not intended to monkey with the wires until we had the poles all set, and when we got to the fifth pole and had to change the wires I do not know why I did not go and get my gloves."
As related by another witness:
"Mr. Moore or Mr. Hayes, one, wondered if there was anything on that wire, and Mr. Hayes did not know. He said he would step back and look it over. . . . When Mr. Moore said `I wonder if anything is on that wire,' Mr. Hayes said, `I will look.'"
When Moore untied and dropped the wire on the fifth pole, deceased, while standing on the wet ground, caught hold of it in his right hand to pull it out of the way. He received a severe electric shock. His associates had the current cut off and got him loose from the wire, but he died from the shock. If he had used rubber gloves he would not have been hurt.
At the conclusion of all the evidence the defendant renewed its motion to dismiss as in case of nonsuit, first entered when plaintiff rested. The motion was allowed and judgment of nonsuit was entered. The plaintiff excepted and appealed. *Page 437 
On plaintiff's exception to the judgment dismissing the action as in case of nonsuit, the familiar rule which requires that the evidence be considered in the light most favorable to the plaintiff prevails. Evidence of the defendant, whether competent or incompetent, which tends to impeach or contradict the testimony offered by plaintiff, is not to be considered. It follows that the assignment of error based on the exceptions to the admission of testimony is without substance.
The exclusion of testimony respecting alleged burns on the trees near the electric line, offered by plaintiff for the purpose of showing that defendant had notice of the defective condition of its line, if competent, does not constitute harmful error. Plaintiff alleges that the poles were rotted and splintered and the wires were of sundry gauges, were spliced together in numerous places and the insulation thereon was badly frayed and worn, by reason of which said poles and wires were in a highly dangerous and defective condition. They were experienced electricians and were aware of the dangerous situation created by such defective and worn condition. Furthermore, "the burns" were visible to the naked eye. If they tended to give notice to the defendant they likewise served to put plaintiff's intestate and his associates on guard.
The widow and children of the deceased were the claimants in the former proceeding. Hayes v. Elon College, 224 N.C. 11. They are the ultimate beneficiaries in case of recovery in this action. Hence the former decision of this Court is res judicata as to the status of deceased as an independent contractor in his relations with defendant. Current v. Webb,220 N.C. 425, 17 S.E.2d 614. It does not, however, bar plaintiff's right to maintain this action. In the former proceeding recovery depended upon the existence or nonexistence of the master-servant relationship. Here the alleged negligence of the defendant is the gravamen of plaintiff's cause of action. The issues involved are not the same. Odum v. Oil Co.,213 N.C. 478, 196 S.E. 823.
So then, we come to the one primary question posed for decision. Did plaintiff offer any testimony which, when considered in the light most favorable to her, tends to show that the death of her intestate was proximately caused by the negligence of defendant, and, if so, does her testimony further show as a matter of law that deceased failed to exercise ordinary care for his own safety?
Many of the authorities cited both by plaintiff and defendant involve the master-servant relationship which imposes upon the master duties in *Page 438 
excess of those which an owner-contractee owes to an independent contractor. So then, while helpful, they are not directly in point.
Ordinarily an employer of an independent contractor may not be held liable for injuries which have been sustained in the performance of the contract by the contractor himself. 35 Am. Jur., 588; Arizona BinghamptonCopper Co. v. Dickson, 195 P. 538, 44 A.L.R., 881; Roddy v. Mo. P. R.Co., 15 S.W. 1112, 12 L.R.A., 746, 24 Am. St. Rep., 333, Anno. 44 A.L.R., 891.
Since independent contractors are not servants of the contractee a contractee, in the absence of some special circumstance or circumstances imposing liability, is not liable as master for injuries sustained by an independent contractor, the contractee's liability, if any, being the same as that imposed on him with respect to third persons generally. 39 C.J., 1349, sec. 1567.
Although there are decisions contra, it is generally held that one who is having work done on his premises by an independent contractor is under the obligation to exercise ordinary care to furnish reasonable protection against the consequences of hidden dangers known, or which ought to be known, to the proprietor and not to the contractor or his servants. 39 C.J., 1345, sec. 1562.
The rule applies only to latent dangers which the contractor or his servants could not reasonably have discovered and of which the owner knew or should have known. 39 C.J., 1348, sec. 1566; 2 Shearman Redfield, Negligence, 689 (Rev. Ed.); 3 Cooley, Torts (4th Ed.), 426.
The owner is not responsible to an independent contractor for injuries from defects or dangers of which the contractor knew or should have known, "but if the defect or danger is hidden and known to the owner, and neither known to the contractor, nor such as he ought to know, it is the duty of the owner to warn the contractor, and if he does not do this he is liable for resultant injury." Douglass v. Peck L. Co., 89 Conn. 662,95 A. 22; Arizona Binghampton Copper Co. v. Dickson, supra; Gowing v.Henry Field Co., 281 N.W. 281; Anno. 44 A.L.R., 894; Steele v.Grahl-Peterson Co., 109 N.W. 882. See also Highway Comm. v.Transportation Corp., ante, 371.
"It has been repeatedly held that where one knowingly places himself in a place of danger which he might easily have avoided he assumes all risks incident thereto." Dreier v. McDermott, 141 N.W. 315, 50 L.R.A. (N.S.), 566; Gowing v. Henry Field Co., supra. And the owner-contractee is not liable for injuries resulting from conditions obviously dangerous and known by the contractor to be so. Highway Comm. v. Transportation Corp.,supra; Gowing v. Henry Field Co., supra.
It follows that plaintiff's one material allegation of negligence is to the effect that the stringing of a high tension wire on house brackets *Page 439 
below the cross arms on the poles constituted a substandard and improper installation and maintenance of high tension wires; that such improper installation created a latent, perilous and highly dangerous condition "of which the plaintiff's intestate did not have and could not have had any prior notice"; and that the defendant negligently and wrongfully failed to notify or warn plaintiff's intestate thereof.
Whether plaintiff offered any evidence which tends to sustain the allegation is seriously debated. He first said he knew the voltage on this wire and then undertook to investigate to make sure. But he either failed to go where he could see or, having seen, disregarded the information thus obtained. Hence it is urged that he did not rely upon any implied representation as to the voltage of the wire arising out of the manner of its maintenance, and therefore defendant's failure to give warning was not, and could not be held to constitute, a proximate cause of his death.
This we need not now decide, for we are of the opinion that the failure of the deceased to exercise ordinary care for his own safety, as disclosed by plaintiff's evidence, whether denominated primary or contributory negligence, was such as to induce the one reasonable conclusion that his own lack of due care proximately caused or contributed to his injury and death.
In appraising his conduct we may assume, without deciding, that the opinion evidence tendered by plaintiff was competent and that the maintenance of the wire partly on house brackets reasonably led deceased to believe it was a low voltage wire. At the same time we must bear in mind that to constitute want of due care on his part it is not required that he should have anticipated that the peril was a deadly one. It is sufficient if he knew or should have known that substantial injury was likely to result from handling a low tension wire in such manner under the conditions then existing. Rushing v. Utilities Co., 203 N.C. 434, 166 S.E. 300: Furthermore, in respect to the work being performed by him, ordinary care means the highest degree of care. Ellis v. Power Co., 193 N.C. 357,137 S.E. 163; Calhoun v. Light Co., 216 N.C. 256, 4 S.E.2d 858;McAllister v. Pryor, 187 N.C. 832, 123 S.E. 92; Turner v. Power Co.,154 N.C. 131, 69 S.E. 767; Haynes v. Gas Co., 114 N.C. 203.
The condition of bad repair was a moving cause for engaging the deceased and his associates to do the work contemplated by their contract. Deceased was not a servant ordered by defendant to do what he did. He was an expert exercising his specialized knowledge according to his own judgment and with his own devices. He knew the danger inherent in the condition of bad repair as well as the peril incident to handling live wires with the naked hand while standing on wet ground. He was *Page 440 
aware of the fact that the danger of handling high tension and low voltage wires under such conditions differed in degree only and that, whether the wire was high tension or low tension, it was dangerous to attempt to handle it without using the protective devices he had at hand.
He knew it was a live wire but did not know the quantity of current it carried. Means of ascertainment were at hand. By tracing the wire a short distance in either direction he could have discovered it was a high tension wire. He likewise had at hand adequate means of protection. He could have used his rubber gloves or he could have directed that the current be cut off. By pursuing either of these courses he could have handled the wire in perfect safety.
Thus it appears that the danger was obvious. Rushing v. Utilities Co.,supra; Perry v. Herrin, 225 N.C. 601; Benton v. Building Co., 223 N.C. 809,28 S.E.2d 491; Morrison v. Mills Co., 223 N.C. 387,26 S.E.2d 857; King v. Mills Co., 210 N.C. 204, 185 S.E. 647; Scott v.Telegraph Co., 198 N.C. 795, 153 S.E. 413; Lunsford v. Mfg. Co.,196 N.C. 510, 146 S.E. 129; 38 Am. Jur., 750, sec. 91; 45 C.J., 875, sec. 306 (6).
At least two perfectly safe courses were open to the deceased, and yet he chose to proceed to handle a live wire with his bare hands while he was standing on wet ground. He discarded the safe and chose instead the patently dangerous and unsafe method of handling a dangerous instrumentality. Covington v. Furniture Co., 138 N.C. 374; Groome v.Statesville, 207 N.C. 538, 177 S.E. 638; Williams v. Mfg. Co., 180 N.C. 64,104 S.E. 31; Clements v. Power Co., 178 N.C. 52,100 S.E. 189; Dunnevant v. R.R., 167 N.C. 232, 83 S.E. 347; Dermid v. R. R.,148 N.C. 180; 29 C.J.S., 608, sec. 53; 45 C.J., 961; 38 Am. Jur., 873, sec. 193. His conduct in so doing evidenced a failure to use ordinary care for his own safety which, if not the sole proximate cause of his injury and death, was at least a direct contributing proximate cause thereof.
We have carefully examined the authorities cited and relied on by plaintiff, including Mack v. Marshall Field Co., 218 N.C. 697,12 S.E.2d 235. They are not at variance with the conclusion here reached. On the other hand, Rushing v. Utilities Co., supra, is in point. See alsoPiedmont Elec. Illuminating Co. v. Patterson's Adm'x., 84 Va. 747,6 S.E. 4; Anderson v. Light Co., 46 A. 593; Barnett v. Electric Co.,10 F.2d 111.
For the reasons stated the judgment below must be
Affirmed. *Page 441