## BROOKS et al. v. UNITED STATES.

No. 6357.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 4, 1952.

Decided Feb. 2, 1952.

John H. Hall, Elizabeth City, N. C. (J. Henry LeRoy, Elizabeth City, N. C., on brief), for appellants.

Morton Hollander, Atty., Department of Justice, Washington, D. C. (Holmes Baldridge, Asst. Atty. Gen., Charles P. Green, U. S. Atty., Logan D. Howell, Asst. U. S. Atty., Raleigh, N. C., Paul A. Sweeney and Massillon M. Heuser, Attys., Department of Justice, Washington, D. C., on brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and WEBB, District Judge.

SOPER, Circuit Judge.

This suit, under the Federal Tort Claims Act, 28 U.S.C.A. § 921 et seq.,[1] was brought by Alphine B. Brooks, Administratrix of Birvin Brooks, to recover damages for the death of Birvin Brooks which occurred on July 27, 1945 as the result of an explosion in a fire pump house located on government property, while employed by the R. S. Jordan Company, a plumbing contractor doing work for the United States. The Jordan Company's insurance carrier paid Brooks' dependents $6,000 under the North Carolina Workmen's Compensation Act, and joined in the suit as a co-plaintiff, demanding that any damages recovered be first applied to reimburse it for the monies it had paid out.[2]

On and after November 14, 1942 the United States owned a Naval Air Base near Elizabeth City, North Carolina, on which were located several buildings and installations, including a fire pump house which furnished the extra water supply needed to protect the Base against fire. On November 14, 1942 the United States entered into a contract with the Consolidated Vultee Aircraft Corporation (Convair) under which the Navy turned over the Base and its facilities to Convair for use by Convair in servicing and modifying military aircraft. Under the contract Convair had full possession and control of all the facilities at the Air Base, except space for Navy personnel stationed at the Base for inspections of operations and installations to see that the contract was properly performed; and Convair

---

1. 1948 Revised Judicial Code, 28 U.S.C.A. §§ 1346, 2671 et seq.

2. See § 97–10 of the Workmen's Compensation Act of North Carolina. Gen.Stat. of North Carolina, 1950.

was in charge of the entire operation at the Base, employed the personnel and carried out the business of protecting the property from fire.

The pump house was a part of the facilities provided for protection of the Base against fire. It was situated on the Pasquotank River, a short distance from the shore, and was constructed entirely of concrete and steel and contained three rooms or compartments—one on the ground level covering the entire floor space, and two below, in a subterranean chamber below the water level, separated from each other by a reinforced concrete partition. One of the lower compartments was known as a wet well and the other, a dry well. Entrance to the dry well, with which we are concerned, was allowed by a three foot square opening through the concrete floor of the upper room. A stationary steel ladder led down to the concrete floor below. The upper compartment contained two gasoline engines, two electrically driven pumps, numerous switches, and some of the pumping equipment. Part of the pumping equipment was located in the dry well below as was a sump pump which had been installed to pump out water that might leak into and accumulate on the floor of the dry well. The sump pump was driven by an electric motor which was put into action when a float installed near the floor was raised sufficiently by the rise of the water to operate an electric switch; and when the float would drop to a predetermined point as a result of the fall of the water level, the electric motor would cease operating. When in proper working order, the entire operation of the sump pump and electric motor was automatic.

The dry well was 15 feet square and 18 feet deep. It was entirely enclosed in concrete except for the opening from the main floor above. It was lighted by an electrically operated bulb in the ceiling of the dry well which was protected by a guard.

Two one-half inch galvanized iron pipes ran along the ceiling of the dry well and were connected at one end through the concrete wall to a gasoline storage tank situated on the outside of the building, and at the other end, up through the concrete floor to the gasoline engines in the upper compartment. One pipe supplied gasoline to the engines and the other served as a return pipe to carry the overflow of gasoline in the carburetors back to the storage tank outside of the building. This latter pipe was equipped with a gate valve in the dry well chamber, which when opened would cause any gasoline in the return pipe to drain out into the dry well itself. At the time of the explosion this gate valve was closed; but on one occasion prior to the explosion it was found to be in a leaky condition and repaired. The main gas line contained threaded and not welded unions, and a seeping leakage was discovered at such a union just after the explosion.

In 1944, while the Base and its facilities were operated and controlled by Convair, the government entered into a contract with Doyle & Russell, general contractors, for the installation of certain additional facilities on the property, including the installation of a third pump in the fire pump house. On September 5, 1944 Doyle & Russell entered into a contract with the R. S. Jordan Company for the installation of this third pump. Under the contract, as the District Judge found, both the contractor and the subcontractor were to perform the work according to their own methods, by their own employees, and subject to no control by the government except as to the end result. During the progress of the work a government inspector visited the site of operations from time to time to ascertain whether the work was proceeding in accordance with the plans and specifications.

At the time of the explosion, the R. S. Jordan Company was engaged in certain work preliminary to the placing of the third pump on the upper floor. It was necessary to make certain connections through the ceiling of the dry well and an air drill had been used to cut a hole through the six inch concrete and steel

ceiling for this purpose. There is dispute as to how long before the accident this work was done; there is no doubt that employees of the sub-contractor had been engaged immediately before the accident in erecting a wooden staging within the well, close to the ceiling, upon which the workmen might stand in connecting the third pump, and this staging was partially completed at the time of the accident.

On the morning of the explosion, there was an accumulation of water upon the floor of the dry well, and the motor of the sump pump had not started automatically upon the rise of the water as it was designed to do. The deceased, an unskilled laborer and helper who had been employed by the R. S. Jordan Company about a year and a half, went down into the dry well for the purpose of starting the sump pump motor. He made one or more unsuccessful attempts to start it by "pushing on the switch," and as "he pushed the switch again" a flash, and an explosion followed by fire occurred, resulting in fatal burns and injuries to the deceased from which he died the next day. One other Jordan Company employee was just starting down the steel ladder into the dry well at the time of the explosion and he was thrown up and out of the well and against some machinery in the upper room.

At the time Brooks entered the dry well, the air therein was highly saturated with explosive vapors caused by gasoline leaking from a union in the gasoline supply pipe running across the ceiling of the well. The District Court found that "The explosion was caused by the ignition of the explosive vapors in the air within the dry well by a spark originating from the electric switch when 'pushed' or moved by the deceased in his effort to start the motor and pump, and the explosion was the proximate cause of the fatal injuries to deceased."

The District Judge reached the conclusion that the res ipsa doctrine did not apply as contended, because at the time of the fatal accident, the property was not under the exclusive management and control of the United States and had not been under its exclusive management and control since the operation of the base had been turned over to Convair under the contract between them. The court, however, took into account the fact that for the purpose of making improvements to the pump house and its equipment the government had to some extent reassumed control of the property by entering into the contract with Doyle & Russell and inviting them upon the premises to carry it into effect. The judge applied the general rule in effect in North Carolina and elsewhere that an owner of land, who impliedly invites another to enter for some purpose of interest or advantage to him, owes to such a person the duty to use ordinary care to have the premises in a reasonably safe condition, and to warn of hidden dangers of which he should have known. See Ellington v. Ricks, 179 N.C. 686, 102 S.E. 510; Revis v. Orr, 234 N.C. 158, 66 S.E.2d 652; Deaton v. Board of Trustees of Elon College, 226 N.C. 433, 38 S.E.2d 561. He found, however, that the United States had no notice of the dangerous situation in the dry well and no knowledge of any fact or circumstance which should have put it on notice that a dangerous condition existed. He reached this conclusion on the ground that the United States had no reason to believe that Convair had failed to perform its duty to maintain the property in safe condition and on the further ground that there was nothing about the nature of the work to be done by Doyle & Russell and its sub-contractor under the contract for the improvement of the pumping station which would cause apprehension for the safety of the workmen employed by the contractors to do the job.

We think that these conclusions were justified since the property had been turned over in a safe condition to the contractors and they had been engaged shortly before the explosion took place in doing work in close proximity to the leaky pipe and might well have caused the loosening of the connection and the escape of the gasoline vapor. It is not

contended that the officers or agents of the government had knowledge of the dangerous condition of the dry well and it cannot be said that the duty was imposed upon the government to protect the servants of the contractor against dangers arising on the premises as a result of his operations. Under the contract it was agreed that the government should have general direction and supervision of the work to see that it was performed in accordance with the contract, but it was also specifically agreed that all work necessary to the successful performance of the work in the pump house and elsewhere should be done under the supervision of the contractor who should assume full responsibility therefor.

 The rule which governs the pending case was laid down in Deaton v. Board of Trustees of Elon College, 226 N.C. 433, 38 S.E.2d 561, where the court was considering the liability of the defendant for injuries suffered by contractors while engaged in making repairs upon the defendant's property. The court said, 226 N.C. at page 438, 38 S.E.2d at page 564:

"Ordinarily an employer of an independent contractor may not be held liable for injuries which have been sustained in the performance of the contract by the contractor himself. * * *

"Since independent contractors are not servants of the contractee a contractee, in the absence of some special circumstance or circumstances imposing liability, is not liable as master for injuries sustained by an independent contractor, the contractee's liability, if any, being the same as that imposed on him with respect to third persons generally. * * *

"Athough there are decisions contra, it is generally held that one who is having work done on his premises by an independent contractor is under the obligation to exercise ordinary care to furnish reasonable protection against the consequences of hidden dangers known, or which ought to be known, to the proprietor and not to the contractor or his servants. * * *

"The rule applies only to latent dangers which the contractor or his servants could not reasonably have discovered and of which the owner knew or should have known. * * *

"The owner is not responsible to an independent contractor for injuries from defects or dangers of which the contractor knew or should have known, 'but if the defect or danger is hidden and known to the owner, and neither known to the contractor, nor such as he ought to know, it is the duty of the owner to warn the contractor, and if he does not do this, he is liable for resultant injury.' "

We think that the District Judge correctly applied this rule in denying recovery in this action, and the judgment is therefore affirmed.