427 F.2d 962
 Eula CRAIG and Elliott Craig, Plaintiffs-Appellants,
v.
OLIN MATHIESON CHEMICAL CORPORATION, Defendant-Appellee.
OLIN MATHIESON CHEMICAL CORPORATION, Defendant-Appellant,
v.
Eula CRAIG and Elliott Craig, Plaintiffs-Appellees.
EICHLEAY-WOLFE COMPANIES, JOINT VENTURERS, Third-Party
Defendant-Appellant,
v.
OLIN MATHIESON CHEMICAL CORPORATION, Third Party Plaintiff-Appellee.
OLIN MATHIESON CHEMICAL CORPORATION, Defendant-Appellant,
v.
Woodrow PARNELL, Plaintiff-Appellee.
 Nos. 17649-17652.
 United States Court of Appeals, Seventh Circuit.
 June 24, 1970.
 
 William W. Schooley, Granite City, Ill., for Craig.
 John W. Leskera, Oehmke, Dunham, Boman & Leskera, East St. Louis, Ill., for Olin Mathieson Chemical Corporation.
 Robert Maucker, Alton, Ill., for Eichleay-Wolfe.
 Before SWYGERT, Chief Judge, and MAJOR and HASTINGS, Senior Circuit judges.
 MAJOR, Senior Circuit Judge.
 
 
 1
 In the early 1960's defendant, Olin Mathieson Chemical Corporation (Olin), began a program which consisted of building a new casting plant and renovating the existing plant facilities at East Alton, Madison County, Illinois. In connection with this program Olin, on June 14, 1963, entered into a contract with the third party defendant, Eichleay-Wolfe (contractor), to perform certain remodeling of the existing Olin tandem mill by removal of the conveyors. In doing so the contractor utilized oxygen-acetylene torches operated by members of the ironworkers' trade. Work was commenced under the terms of the contract on September 7, 1963. On that date two of the contractors' employees, Elliott Craig and Woodrow Parnell, received serious injuries as the result of the explosion of an instrumentality which they were using.
 
 
 2
 Craig and Parnell instituted a suit against Olin, alleging that the injuries sustained were the result of negligence on the part of Olin. Eula Craig, wife of Elliott, joined in this action against Olin, claiming damages for loss of services as a result of the injuries sustained by her husband. Olin by answer denied negligence on its part and alleged that the injuries sustained by Craig and Parnell were the result of their own negligence and that they were guilty of contributory negligence as a matter of law, which constituted a bar to their action against Olin.
 
 
 3
 In the meantime, Olin brought a third party indemnity action against the contractor, based upon both the terms of the contract and the common law.
 
 
 4
 The cases were consolidated and tried before a jury. The jury returned verdicts against Olin in favor of Elliott Craig in the sum of $12,000; in favor of Woodrow Parnell in the sum of $1,500, and in favor of Eula Craig in the sum of no dollars and no cents. From the judgment entered on these verdicts the Craigs appeal on the ground that they were so inadequate as to be clearly erroneous, and seek a remand for a retrial on the issue of damages only. From the judgment in favor of Parnell, Olin appeals.
 
 
 5
 In the action by Olin against the contractor for indemnity the parties agreed that the issue of contractual indemnity should be submitted to the trial court for determination, which was decided adversely to the contractor. The common law issue of indemnity was submitted to a jury, which returned a verdict in favor of Olin and against the contractor. The court entered judgment for indemnity in favor of Olin and against the contractor. From this judgment the contractor appeals.
 
 
 6
 In this connection it is pertinent to note that Olin in the action against it for damages moved for a directed verdict at the conclusion of plaintiffs' testimony and again at the conclusion of all of the testimony. Ruling on such motions was reserved by the court. After verdict, such motions were denied, as well as Olin's motion for a judgment notwithstanding the verdict. Like motions were made by the contractor in the indemnity action against it, with similar rulings by the court.
 
 
 7
 We shall first consider the appeal by plaintiffs in their action against Olin. On this phase of the case we have reached the conclusion that there was no adequate proof of negligence on the part of Olin and, in any event, the employees Craig and Parnell were chargeable with contributory negligence which as a matter of law was a bar to their action. Therefore, we hold that the court erred in its denial of Olin's motion for a directed verdict and in its denial of Olin's motion for a judgment notwithstanding the verdict.
 
 
 8
 With the conclusion thus reached, plaintiffs' contention that the amounts awarded by the jury were so inadequate as to be clearly erroneous becomes irrelevant.
 
 
 9
 The conclusion also calls for a rather detailed statement of facts. Recognizing our function to view the evidence in the light most favorable to plaintiffs, we take our statement mainly from their brief. Before doing so, however, we think it is relevant to set forth pertinent provisions of the contract entered into between Olin and the contractor, the employer of Craig and Parnell. It provides:
 
 
 10
 '(2) The Contractor shall furnish all labor, Materials, Construction Items, all services, equipment, and shall perform all of the Work required for the construction and completion of the Project * * *.
 
 
 11
 '(5) The execution, direction, management and performance of the entire Work under the Contract, and the completion of the Project in accordance with all the terms and conditions of the contract, shall be carried out and performed under the direction and personal supervision of a Resident Project Manager, who shall be Mr. Glenn A. Wolfe, and who shall have absolute and full power of management and direction in all matters relating to such work, and with full power to Act for M. H. Wolfe and Company and Eichleay Corporation, the Joint Adventurers (the Contractor hereunder), to do all things necessary or required to be done or performed by the Contractor, under the terms and conditions of the Contract, including without limitation * * *.
 
 
 12
 '* * * In addition thereto, contractor represents that it has special qualifications for doing the work and completing the project and will complete the work and project to the satisfaction of owner in full conformity with the highest current standards of the respective trades.
 
 
 13
 '16.2 Contractor shall take all necessary precautions against the possibility of fire and any other hazard to persons or property, and shall comply with all applicable provisions of Federal, State and Municipal safety laws and building codes to prevent accidents or injury to persons on, about or adjacent to the Jobsite. Contractor shall erect and properly maintain at all times, as required by the conditions and progress of the Work, all necessary safeguards for the protection of workmen and the public * * * and Contractor shall designate a responsible member of its organization on the work whose duty shall be the prevention of accidents. The name and position of any person so designated shall be reported to the Engineer and Owner by Contractor.'
 
 
 14
 Olin prior to the execution of the contract utilized the tandem mill to roll and squeeze cast bars of hot brass between ringers to make them into long thin sheets. In this operation it used large amounts of grease and oil to lubricate the conveyors and ringers and to cool the brass. The grease and oil dripped to the floor or into pans, and over the years the machinery became coated with oil. The contract called for removal of these conveyors. The contractor started work to remove them on September 7, 1963, the day plaintiffs were injured. Under the contract, Olin allowed the contractor twenty-nine days to complete the job, working twenty-four hours per day, under a work schedule called a 'critical path schedule.'
 
 
 15
 Prior to entering the contract, Glenn Wolfe, owner of the M. H. Wolfe Construction Company and project engineer for the joint venture, inspected the conveyor area with Lino Marcon, project manager for Olin, and noted the grease and oil on the conveyors. To remove the conveyors the contractor utilized oxygen-acetylene torches operated by members of the ironworkers' trade.
 
 
 16
 Craig was a thirty-five-year old construction ironworker. Among his duties were erecting structural steel, installing reinforcing steel in concrete, welding and burning metal, and moving machinery. He had been using oxygen and acetylene welding equipment for welding and burning since he started as an ironworker in 1949. He had been instructed in the use of oxygen-acetylene torches while serving a two-year apprenticeship. Parnell was also an experienced ironworker. Both were aware of the importance of keeping the connections of the torch free from dirt and oil. Craig had been working for the contractor approximately twelve months prior to the date of the accident. Some two weeks prior to the time of the accident, Craig knew he was going to work removing the conveyors. He made an inspection of the area with Marcon, construction superintendent. He stated that he asked that the dirt and grease be cleaned from the area, which statement was denied by Marcon.
 
 
 17
 On September 7, 1963, Craig and Parnell were assigned to burn out anchor bolts and conveyors. This process was accomplished by means of an oxygen and an acetylene tank mounted on a two-wheel dolly cart. On top of each tank was a gauge with both high and low pressure valves. After working for an hour or so, plaintiffs' clothes and gloves became saturated with oil and grease.
 
 
 18
 Craig and Parnell started to work at 8 a.m. September 7, 1963, and went to dinner at 5 p.m. During the day there was no difficulty with the tanks or gauges. Shortly after dinner, they ran out of oxygen. The gauges were taken off the oxygen tank by Craig and placed on a cart. They went to a storage area approximately fifty feet away, deposited the old tank and picked up a new one. Upon returning to their work they rehooked the gauges and hoses to the tank. Craig looked but did not see any grease on the fittings before they were rehooked. Parnell then opened the high pressure valve to let air to the gauge, which instantaneously exploded, causing the injuries complained of. Craig admitted that he did not receive any directions from Olin personnel.
 
 
 19
 Plaintiffs introduced the testimony of an expert witness who conducted experiments in the presence of the court and jury and, in response to a hypothetical question, gave it as his opinion that the opening of the high pressure oxygen valve would cause high pressure oxygen to come into contact with a combustible material such as oil or grease in the area between the tank and the low pressure valve, resulting in a fire and explosion similar to the one described by Craig.
 
 
 20
 Marcon, construction superintendent for Olin but called as a witness by plaintiffs, testified that the area in which the contractor was to work was marked off and turned over to the contractor. He was permitted to make inspections of the area but not to give instructions to employees on the job. He had authority to give orders to Wolfe in a limited way so as to keep the work on schedule and to see that it was properly done.
 
 
 21
 Plaintiffs introduced certain safety regulations subscribed to by Olin, which suggested that employees refrain from handling oxygen cylinders or apparatus with oily hands or gloves.
 
 
 22
 In summary, the area involved, owned by Olin, was turned over to the contractor who by the terms of the contract had 'absolute and full power of management and direction in all matters relating to such work.' All equipment, including the oxygen-acetylene torches used by plaintiffs, was owned and furnished by the contractor. Olin removed its employees from the restricted area and had no control over or the right to direct the manner and means by which plaintiffs as employees of the contractor performed their work. All of the parties-- Olin, the contractor and the employees-- were aware of the condition as to the oil and grease at the time the area was turned over to the contractor. It is not discernible how a finding of negligence on the part of Olin can be sustained. If there was any negligence which was the proximate cause of plaintiffs' injuries, it was the manner in which they used the equipment furnished by the contractor.
 
 
 23
 Excerpts from the testimony of Elliott Craig are pertinent:
 
 
 24
 'Q. Mr. Craig, you have been in the trade as an ironworker since 1949, is that right, sir?
 
 
 25
 A. Yes.
 
 
 26
 Q. And at what age were you when you went into the trade?
 
 
 27
 A. Twenty-one, I believe.
 
 
 28
 Q. Twenty-one. All right now, did you go to an apprentice school?
 
 
 29
 A. I worked, I wasn't going to an apprentice school, but I worked two years before I received a journeyman's book, yes.
 
 
 30
 Q. Did you work for another ironworker, or that is, did you work under other ironworkers, is that right?
 
 
 31
 A. Yes.
 
 
 32
 Q. And these fellows would instruct you on the application of your trade, is that right, sir?
 
 
 33
 A. Yes.
 
 
 34
 Q. Did they instruct you with respect to the use of a torch?
 
 
 35
 A. Yes.
 
 
 36
 Q. Is the torch a usual and normal instrument or tool to be used by ironworkers?
 
 
 37
 A. Yes.
 
 
 38
 Q. Virtually every job you go on that you do any ironworking you use a torch, do you not?
 
 
 39
 A. Right.
 
 
 40
 Q. When you went on the job, under whose direction were you?
 
 
 41
 A. Milton Strong.
 
 
 42
 Q. And who did Milton Strong work for?
 
 
 43
 A. Eichleay-Wolfe.
 
 
 44
 Q. Was he the general foreman over your trade?
 
 
 45
 A. Yes, sir.
 
 
 46
 Q. Well, did you see Glenn Wolfe, was he out there on the job?
 
 
 47
 A. Yes, sir.
 
 
 48
 Q. And your immediate supervisor, I take it, was Milton Strong who was the ironworkers' general foreman, is that right?
 
 
 49
 A. Yes, sir.
 
 
 50
 Q. And did most of your directions come from him?
 
 
 51
 A. All of them.
 
 
 52
 Q. All of them. Wasn't anybody else who had any right or had any business directing you except Mr. Milton Strong, is that right?
 
 
 53
 A. Right.
 
 
 54
 Q. All right. Now wnen you hooked originally that morning, when you hooked these gauges onto these tanks, didn't you check or did you check to see if these connections were free of dirt and grease and so forth?
 
 
 55
 A. We always do.
 
 
 56
 Q. That's a normal, standard procedure, is it not?
 
 
 57
 A. Right.
 
 
 58
 Q. All right. Now then, when you hooked these hoses on, I take it that we've got the gauges hooked to the tanks now, and when you hooked these hoses on, did you check these connections to see they were free of dirt and grease and so forth?
 
 
 59
 A. Yes, sir, best I could, see they were free, because that was what I was always informed to check them and see that they are clear.
 
 
 60
 Q. Right. And that's what every ironworker is instructed even in apprentice school, is he not?
 
 
 61
 A. Yes.
 
 
 62
 Q. Be sure these connections are free of dirt and grease and so forth, isn't that correct, sir?
 
 
 63
 A. Yes.
 
 
 64
 Q. Now tell me this, no one from Olin Mathieson Chemical Corporation was directing you in the operation of this work, were they?
 
 
 65
 A. No.'
 
 
 66
 Plaintiffs' case rests on the premise that Olin was remiss in its duty to furnish the employees of the contractor with a safe place to work. Many Illinois cases are cited which generally embrace the principle announced in Calvert v. Springfield Electric Light and Power Co., 231 Ill. 290, 83 N.E. 184. Plaintiffs on brief quote from this case (page 293, 83 N.E. p. 185):
 
 
 67
 'The law is well settled that an owner or occupant of land, who by invitation, express or implied, induces or leads others to go upon premises for any lawful purpose, is liable for injuries occasioned by the unsafe condition of the land or its approaches, if such condition was known to him and not to them, and was negligently suffered to exist without timely notice to the public, or to those who are likely to act upon such invitation, and if there are hidden dangers upon the premises, he must use ordinary care to give persons rightfully upon the premises warning thereof, and that the owner owes such duty to an independent contractor or his servants while working upon his premises.'
 
 
 68
 The principle thus announced is of no benefit to plaintiffs inasmuch as the presence of oil and grease, of which they complain, was as well known to them and their employer as it was to Olin. It was not a hidden danger, it was obvious to all.
 
 
 69
 In National Builders Bank of Chicago v. Schuham, 319 Ill.App. 546, 49 N.E.2d 825, the court held that the owner of property owes to an independent contractor and his servants who work thereon on the duty of exercising reasonable care to have the premises in a safe condition for the work, unless the defects responsible for the injury are known to the contractor.
 
 
 70
 In the late case of Ragni v. Lincoln-Devon Bounceland, Inc., 91 Ill.App.2d 172, 234 N.E.2d 168, 169, the Calvert rule was applied where a directed verdict for the defendant was affirmed in a suit arising from a trampoline accident. The court found that plaintiff, by the exercise of care of an ordinarily intelligent person, should have been aware of the obvious dangers involved in jumping upon a mat.
 
 
 71
 In Brunet v. S. S. Kresge Co., 7 Cir., 115 F.2d 713, 715, this court quoted from the Calvert rule and denied recovery to a plaintiff who sued because of a fall on slippery steps. We noted that there was nothing hidden in the slippery and wet condition of the stairway and that the plaintiff, being apprised of the condition, should be held to as high a degree of care for her own safety as was the owner of the premises.
 
 
 72
 A case of some relevancy because of its similarity of facts is Deaton v. Board of Trustees of Elon College, 226 N.C. 433, 38 S.E.2d 561. In that case the college employed an independent contractor to make repairs of its electrical system. The defendant was held as a matter of law not liable for the death of one of the employees who while standing on wet ground touched a live wire and was electrocuted. The independent contractor knew at the time of making the contract that some of the wires were high tension. The court concluded that the owner was not liable for injuries resulting from conditions obviously dangerous and known by the contractor to be so. Further, the court reasoned that the contractor was an expert, exercising his specialized knowledge according to his own judgment and with his own devices, and that he was aware of the danger inherent in the condition, as well as the peril incident to handling live wires while standing on wet ground.
 
 
 73
 Plaintiffs on brief attempt to escape the Illinois rule with the statement:
 
 
 74
 'The defective conditions upon which the Illinois Courts have ruled concern an isolated danger which can be avoided if the employee has the knowledge of the danger. Craig and Parnell encountered a condition in which there was no way to escape the oil and grease in the performance of their duties. It is similar to throwing a person in a swimming pool and telling them not to get wet.'
 
 
 75
 It seems implicit in this argument that Craig and Parnell were under some sort of compulsion to work even though they had knowledge of the dangerous condition. Of course, that is not the case. The swimming pool illustration is inept. A better one would be, a person who couldn't swim, and with knowledge of the danger, jumping into a swimming pool and drowning.
 
 
 76
 Plaintiffs on brief come close to admitting that they were contributorily negligent. They state:
 
 
 77
 'Although Olin contends and we concede that both Craig and Parnell were aware of the importance of keeping the connections in the torch free from grease and dirt, neither knew of the danger of an explosion.'
 
 
 78
 It is a novel theory, we think it is not the law, that a person can escape responsibility for his negligence on the ground that he did not know what the consequences would be.
 
 
 79
 Plaintiffs also rely upon Restatement of Torts 2d, Section 413, which relates to the duty to provide for the taking of precautions against dangers involved in work entrusted to a contractor, and cite cases from other jurisdictions which have applied this section and which purportedly announce a rule different from that followed by the Illinois courts. Plaintiffs on brief state:
 
 
 80
 'A search of Illinois cases has failed to reveal any court in Illinois which has applied Section 413 of the Restatement of Torts 2d to employees of the independent contractor.'
 
 
 81
 We see no reason to pursue the argument in this respect as we are obligated to follow the law as announced by the Illinois courts.
 
 
 82
 While the question is not free from doubt, we think the proof was insufficient to establish the charge of negligence against Olin. In any event, the proof is clear that plaintiffs were not in the exercise of due care and caution for their own safety and, therefore, were guilty of contributory negligence as a matter of law.
 
 
 83
 We conclude and so hold that the court erred in its denial of Olin's motion for a directed verdict and its motion for a judgment notwithstanding the verdict.
 
 
 84
 This brings us to the appeal by the contractor from the judgment in favor of Olin in its action for indemnity. As already noted, Olin sought recovery on two grounds, (1) the common law, and (2) the provision of the contract between Olin and the contractor. The common law issue was submitted to the jury, which returned a verdict in favor of Olin. The contractual issue was by agreement of the parties submitted to the court and determined in favor of Olin. We think Olin is entitled to prevail if either theory is supportable. In fact, the court appears to have rendered judgment only on the contractual provision. Its judgment order recites:
 
 
 85
 '* * * and the Court further allows the Motion of the Third Party Plaintiff, OLIN MATHIESON CHEMICAL CORPORATION for judgment in its favor and against the Third Party Defendant, EICHLEAYWOLFE COMPANIES on the written contract of indemnity including damages, attorney's fees and expenses * * *.'
 
 
 86
 By the judgment Olin was awarded the sum of $13,500 as damages, the amount awarded to Craig and Parnell, $12,000 to the former and $1,500 to the latter, and $5,825.23, for attorney fees and expenses up to the date of the judgment, March 4, 1969.
 
 
 87
 The contractor on brief states the issue for review, insofar as it pertains to its contractual liability, as follows:
 
 
 88
 'Whether the indemnity agreement between third party plaintiff and third party defendant indemnified third party plaintiff against its own negligence proximately causing plaintiffs' injuries.'
 
 
 89
 We think this issue has become moot in view of our decision exonerating Olin (third party plaintiff) of negligence proximately causing plaintiffs' injuries and reversing the judgments against Olin. Obviously, Olin is not entitled to recover damages in the amount of $13,500, awarded to Craig and Parnell, and the judgment will be modified in that respect. Olin is entitled to recover $5,825.23, the amount of attorney fees and expenses included in the judgment, without prejudice to the right of the court to allow such further attorney fees and expenses as the court may determine to be reasonable.
 
 
 90
 The case of Eula Craig, Elliott Craig and Woodrow Parnell against Olin Mathieson Chemical Corporation is reversed and the cause remanded, with directions to enter a judgment in favor of Olin. The case of Olin Mathieson Chemical Corporation against Eichleay-Wolfe Companies is remanded, with directions to modify the judgment in accordance with this opinion.