### HORACE B. PETTY v. CRANSTON PRINT WORKS COMPANY, A CORPORATION.

(Filed 13 January, 1956.)

**1. Negligence § 17—**

In order to recover for actionable negligence plaintiff must establish (1) a legal duty, (2) a breach thereof, and (3) injury proximately caused by such breach.

**2. Master and Servant § 12—**

In an action by the employee of an independent contractor against the contractee to recover for personal injuries, the duty owed by the contractee to the employee arises from and is determined by the relationship subsisting between them.

**3. Master and Servant § 4a—**

Where a subcontractor is employed to make necessary repairs in a heating system, subject to the right of the contractor and the owner to inspect but without the right of supervision during the progress of the work, the subcontractor is an independent contractor, and in regard to the liability of the owner for injury to an employee of the subcontractor, whether the contractor was an agent of the owner or was acting for itself in the discharge of a duty owed the owner, is immaterial.

**4. Master and Servant § 12—**

A contractee who furnishes an independent contractor an instrumentality for the performance of the work gratuitously without contractual obligation or usage requiring the furnishing of such instrumentality, is not under duty to inspect the equipment before or during the period of permissive use, but is under duty only to disclose latent defects of which it has actual knowledge or notice.

**5. Same—**

The liability of the contractee for injury to an employee of the independent contractor in the performance of the work cannot be greater than that of an employer to an employee.

**6. Same—Nonsuit held proper in this action by employee of an independent contractor against contractee to recover for negligent injury.**

Plaintiff, an employee of an independent contractor, was injured when he fell from a movable scaffold in the performance of his work. The allegations and evidence were to the effect that the scaffold was furnished by the contractee, that at each caster of the scaffold was a set screw to lock

the caster and wheel, but that during the progress of the work it was discovered that the set screws were defective, and the contractor's employees obtained from the contractee's storeroom keeper a cap screw in lieu thereof, there being no set screws in stock, that the cap screw repeatedly became stripped in use and was several times replaced by another, and that while the employees of the independent contractor were at work on the top of the scaffold it suddenly rolled, causing plaintiff employee to fall to his injury. It further appeared that the contractor had his own "A" ladders, that the contractee neither constructed the scaffold nor was obligated to provide it, and that its use by the employees of the contractor was merely permissive. *Held:* Nonsuit was proper.

**7. Same—**

Where the evidence discloses that the employees of an independent contractor had actual knowledge of an alleged defect in the scaffold owned by the contractee and used permissively by the employees of the contractor, failure of the contractee to warn of the defect is without significance.

**8. Same—**

Where employees of an independent contractor permissively use the scaffold of the contractee in the performance of their work, notice of a defect therein given the contractee's storeroom keeper or other employee rather than the contractee's employees in charge of the equipment, is not notice to the contractee, nor is notice to the contractor notice to the contractee.

**9. Appeal and Error § 39e—**

Where the evidence admitted tends to establish a particular fact, the exclusion of other evidence offered for the purpose of establishing the same fact, cannot be prejudicial upon review of judgment as of nonsuit.

APPEAL by plaintiff from *Patton, Special J.,* 21 March, 1955, Extra Term, of MECKLENBURG.

Civil action to recover damages for personal injuries, alleged to have been caused by the negligence of defendant. Plaintiff's appeal is from a judgment of involuntary nonsuit.

Plaintiff was injured on Sunday, 2 March, 1952, between 8:30 and 10:00 a.m., when he fell from a rolling stage scaffold. This occurred while plaintiff, Ferguson and Cagle, employees of Industrial Piping Company, were at work on the scaffold platform, undertaking to replace and fasten on a heater suspended from the ceiling a steel plate about 5 by 8 feet in size and weighing about 75 pounds. Plaintiff was a steam-fitter's helper. Ferguson was a steam-fitter welder. Cagle, a steam-fitter, was foreman on this job.

Piping Company's employees were at work in the manufacturing plant of Cranston Print Works Company, at Fletcher, N. C. The scaffold belonged to Cranston. It was kept in the plant. It had been used and was available for use by regular Cranston employees and by others,

*e.g.*, painters, who came in to do work in the plant, referred to as "transient employees."

Cranston's plant was built in 1948. J. E. Sirrine & Company, under a cost-plus contract, designed the plant and supervised its construction, including the heating system. In the Fall of 1951, the heating system wasn't functioning properly. Of the 30 heating units in the plant, some 15 to 23 of the heaters had frozen and "busted." Gaffney, Cranston's plant engineer, "called on" J. E. Sirrine & Company to remedy the deficiency, which Company made arrangements for the Piping Company, located in Charlotte, to go to the Cranston plant and do the necessary work.

In the latter part of January, 1952, Piping Company sent Cagle, foreman, and a crew of workmen, including plaintiff, to the Cranston plant. The equipment they took, for work on overhead heaters, consisted of "A" ladders. By use thereof, Cagle checked the heaters. The defective heaters were identified.

The ceiling of Cranston's plant was about 21 or 22 feet high at the location of the heater on which Piping Company's employees were working when plaintiff fell. Each heater was housed "in a big box about 8 feet long and about 5 or 6 feet high and maybe 3 or 4 feet deep. There were fans in there, motors, heating coils and controls. They were mounted up in the ceiling of the plant." "Each of these heaters was a separate unit." To gain access to the machinery inside the heater box, it was necessary to remove the steel plate, described above. In replacing it, it was necessary to hold the plate against the heater and adjust its position exactly so as to line up the holes in the plate with those within the heater box so that the plate could be fastened by means of screws. Piping Company's employees were attempting to do this when plaintiff fell.

The scaffold consisted of (1½″) metal tubing. As to height, it consisted of three 5-foot sections, one on top of the other(s). All three sections were set up and in use on the occasion plaintiff fell. The area at the top was a space 5 x 7 feet. The scaffold rested on four casters, one at each corner. At each caster was a set screw or wing bolt, with threads up to the head of the screw or bolt, which bolt could be tightened by hand. When tightened, this bolt would lock the caster and wheel. A threaded bolt, in the vernacular of the machinist, is a screw.

Before considering the evidence bearing more directly on the subject of defendant's actionable negligence, we look to the complaint.

Plaintiff alleged, in substance: that "it was necessary for them (Piping Company's employees) to have a scaffold or other elevated appliance to stand on in doing their work"; that Cranston "furnished to the plaintiff's employer a rolling stage scaffold . . . in doing the

work" it "had contracted to do" for Cranston; that Gaffney, Cranston's plant engineer, had the duty of keeping Cranston's equipment, particularly the scaffold, "in good repair and in a safe condition for use and equipped with proper set screws"; that Hill, Cranston's employee, "was charged with the duty of determining whether said scaffold was fit for use in connection with said work, and with the further duty of seeing that it was in good repair and safe for any use to be made thereof"; that the scaffold "was equipped with rollers or wheels and set screws which were supposed to lock the rollers or wheels in place"; and that when plaintiff and his fellow employees were at work thereon, the scaffold "suddenly rolled away from the part of the heating equipment upon which the plaintiff was working while standing on said scaffold, causing plaintiff to fall between the scaffold and the heating equipment to the floor," and to sustain serious and permanent injuries.

Plaintiff's specifications of Cranston's actionable negligence are, in substance: (1) that proper set screws were not used and those used were defective, on account of which the scaffold was not in a safe condition; (2) that such defects were not apparent to plaintiff; and (3) that Cranston failed to exercise due care to discover such hidden defects and to warn plaintiff thereof.

Before trial, judgment of voluntary nonsuit was entered as to Gaffney and Hill, originally defendants herein.

Gaffney, as Cranston's plant engineer, was "in charge of maintenance, construction, and engineering work and in charge of the equipment as well as the building maintenance of the equipment." Hill was in charge of Cranston's "heating system and was foreman of the pipe fitters, heating plant, boiler room." Conner was Cranston's chief mechanic. Philpott had charge of Cranston's storeroom for tools and parts. Hunsinger was employed by Cranston as a steam-fitter's helper.

After Piping Company's employees started work, they located the scaffold. Plaintiff and Cagle went to a lumber pile in the yard on Cranston's premises, got some boards and made a platform for the top of the scaffold. "The boards were of random length . . ." One or more extended some 14 inches beyond the cross-piece of the scaffold. Plaintiff testified: "Before going upon the scaffold, we locked the wheels by tightening the screws that fasten the wheels and got some boards and scotched each wheel up. We then climbed the scaffold and started taking the back off the heater, a cover in the back of the heater."

According to plaintiff: Piping Company's employees used the scaffold 2 or 3 days before he "noticed anything about it moving." Then, when they were in process of taking the back off a heater "the scaffold rolled." They got down, "unloosened all the pins (set screw or wing bolts) in the wheels and took them out . . . discovered that

one pin the wheel had been—the threads on it had been stripped very bad." He took it to Philpott and asked for another pin. Philpott gave him a cap screw to replace the pin. It was different in that it did not have any flanges on it. "By flanges, I mean a wire pin running through the set screws that's in these wheels now (referring to exhibit in courtroom) so you could tighten it up with your fingers." "The one we got from the storeroom had to be tightened with a pair of pliers or a wrench." He took the cap screw to Cagle. It did not have the proper thread. Cagle and plaintiff took it back to Philpott, who then gave them a cap screw "with the proper thread." Plaintiff testified: "He said he had some (set screws) ordered and was supposed to be in that week." "He told me it (the cap screw) would hold and would work until the others came in." "We took the cap screw back and used it instead of a set screw." "We tightened it up and it held. The one that we took out of there would spin." Plaintiff testified: "After the screw was stripped it was our practice to check that cap screw some eight or ten times a day." They did this each time they loosened the screws in order to move the scaffold from place to place. The cap screw was tightened with a wrench. After a while, "we discovered that the threads on that cap screw had become stripped, . . . would spin like the original set screw . . ." When they found they couldn't tighten it with a wrench so as to make it hold, "we took it out and carried it to the storeroom and obtained another and put that cap screw in the scaffold." In all, at least three cap screws were so obtained and used. The set screw had more threads on it than the cap screw, threads all the way up to the bolt. Plaintiff's testimony relates to the use of these cap screws in lieu of the set screw on which the threads had been stripped. His testimony does not identify the particular caster or wheel where this worn set screw was discovered.

According to Ferguson: he got to the Cranston plant some two weeks after Cagle and plaintiff had started their work. After he had worked there some 3 to 5 days, "we was up on the scaffold" when "the wheels rolled on it." He then examined the wheels, "found the holes to be defective and the screw hole in the caster was defective and that the bolts they had put in them had also partially lost their threads." "I found the set screws defective in two of the wheels. The sockets in the castings were defective, they were very badly worn. The new screw (*sic*) that were put in there still had some side motion in there. When we put a new screw in it would hold temporarily. . . . I told the storekeeper, Mr. Philpott, that the sockets in these wheels were defective or something similar to that." They didn't have them, so they had to take cap screws instead. A set screw is "case-hardened." "A cap screw is mild steel, ordinarily it's put in permanently to stay in one place. A

set screw is put in to be changed at different times, therefore, it's hard."
The two sockets that were worn were on the same side of the scaffold,
the left side; and when plaintiff fell they were on the side plaintiff was
on. Before plaintiff fell, "Mr. Hunsinger came to us to borrow the
scaffold . . . and we told him that we had put them (boards) around
there to try to keep the scaffold from moving and, of course, we pointed
out the defective caster to Mr. Hunsinger. Then after we discussed the
wheels and he took the scaffold and done some minor job, he had it for
some time, and he brought it back to us then."

According to Cagle: When they needed parts, "I could borrow it
from the parts room." Piping Company was to replace or pay for such
parts. No conversation with Philpott is mentioned. When they found
the set screw, where the threads were stripped, all set screws were good
except the one. Later, they discovered that "the threads in one of the
housings was stripped. . . . At that time we decided to replace all the
set screws" and put them in. The "cap screws we obtained matched and
fit in there properly." This was three or four weeks before plaintiff
fell. "We tightened them (the cap screws) with an adjustable wrench."

During this period of five or six weeks before plaintiff's injury, Cran-
ston employees came and got the scaffold at least three times. On one
occasion, Gaffney notified Cagle that painters were coming in and
would be using the scaffold over the coming week-end but that "he
would see that from every week-end there on out" Piping Company's
employees "would have the scaffold."

Now, coming to the occasion of plaintiff's fall and injury.

According to plaintiff: He, Cagle and Ferguson were on the scaffold
platform. Facing the open end of the heater box, he was at the left,
Cagle was in the center and Ferguson was at the right. Plaintiff's right
hand was under the steel plate, his left hand gripping the left end
thereof. Ferguson's position was exactly reversed. Cagle was giving
directions as to lining up the steel plate opposite the holes through
which it was to be fastened by screws. The scaffold platform was
placed "flush up against the heater." "Without moving one of the
cross-pieces in place, we couldn't get close enough to the heater to work
on it. We took one of the cross-pieces off the scaffold so as to be able
to work on the heater." The heater was a little longer than the scaffold.
Cagle asked him to raise his end a little bit. When he did so, "the
scaffold started rolling backwards and pitched me forwards down be-
tween the heater and the scaffold, causing me to go off head-first." He
knew nothing more until he came to in the hospital. Before going upon
the scaffold that day, "we checked all the set screws and them cap
screws we had in the scaffold to make sure they were tightened, we
jarred, I mean shook, the scaffold to make sure it was tight and we also

made sure it was tight by putting a wrench on the cap screws and testing them with our hands, the set screws, and we also scotched the boards up under the wheels a little bit tighter."

According to Ferguson: Under circumstances substantially the same as described by plaintiff, "suddenly the scaffold began to roll away. Mr. Petty's side, . . . began to roll away from the heater." At the time of plaintiff's fall, the scaffold moved about 6 or 8 inches. After plaintiff and Cagle had fallen and he (Ferguson) had moved around, "it kept on moving around about 3½ to 5 feet on that end. My end didn't move any at all hardly, if any."

According to Cagle: "On the occasion of his (plaintiff's) fall . . . I felt some part of the scaffold shift a little bit and throw Mr. Petty off balance and at that moment we both fell through the heater." "Q. But so far as you know, on that occasion the scaffold did not roll? A. Not that I know of."

No examination was then made of the casters, wheels, screws, etc. Cagle continued to work on the scaffold about two weeks after plaintiff was injured. Cagle testified: "It did not at any time during that period roll with me that I remember."

Other evidence, largely unfavorable to plaintiff, need not be recited.

At the close of plaintiff's evidence, the court granted defendant's motion for judgment of involuntary nonsuit. Plaintiff excepted and appealed, assigning as error the rendition of such judgment and the court's exclusion of certain evidence offered by plaintiff.

*G. T. Carswell and Robinson & Jones for plaintiff, appellant.*
*Carpenter & Webb for defendant, appellee.*

BOBBITT, J. The facts disclosed by the evidence impel the conclusion that judgment of involuntary nonsuit was proper.

To recover damages for actionable negligence, plaintiff must establish (1) a legal duty, (2) a breach thereof, and (3) injury proximately caused by such breach. *Ramsbottom v. R. R.,* 138 N.C. 38, 41, 50 S.E. 448. Plaintiff's action is in tort. Even so, the duty owed by defendant to plaintiff arises from and is determined by the relationship subsisting between them. *Pinnix v. Toomey,* 242 N.C. 358, 87 S.E. 2d 893.

Plaintiff was not an employee of Cranston. He was an employee of Piping Company; and as such was awarded compensation by the North Carolina Industrial Commission because this accident arose out of and in the course of such employment. Piping Company's compensation carrier paid the award and to that extent is interested in recovery by plaintiff herein.

Whether J. E. Sirrine & Company, in arranging for the Piping Company to make the necessary repairs, was agent for Cranston, as contended by plaintiff, or acting for itself in discharge of a duty it owed Cranston, is immaterial. Piping Company was an independent contractor. In effect, plaintiff so alleged; and, by uncontradicted evidence, it is established. While the final result was subject to inspection both by J. E. Sirrine & Company and by Cranston, neither had any supervision of the Piping Company's work during its progress. *Hayes v. Elon College,* 224 N.C. 11, 29 S.E. 2d 137.

There is neither allegation nor evidence that Cranston was obligated by contract or otherwise to furnish a scaffold for use by Piping Company or its employees. Further, there is neither allegation nor evidence that Piping Company or its employees had used Cranston's scaffold or had worked for Cranston or in its plant on any prior occasion.

Plaintiff's allegation is that Gaffney, Cranston's mill engineer, and Hill, alleged to have had charge of Cranston's equipment, particularly the scaffold, "had authority to permit the use of said scaffold by plaintiff's employer."

Plaintiff alleged that it was necessary for Piping Company's employees "to have a scaffold or other elevated appliance to stand on in doing their work." For this purpose, they brought "A" ladders; and by means thereof they inspected the heaters. There is no evidence that Piping Company or its employees had prior knowledge that Cranston had a scaffold. They discovered it after arrival at Cranston's plant. Whether a sufficient platform could have been provided by extending planks between the "A" ladders does not appear. There is evidence that a scaffold was necessary to the performance of Piping Company's work. It is plain that a scaffold, especially a movable scaffold, was more convenient and better adapted to the work. It does not appear whether the casters could be removed so that the scaffold would rest on stationary footings rather than on wheels. It is common knowledge that this may be done with scaffolds of this general type. In any event, the use of the casters facilitated the removal of the scaffold from place to place, as Piping Company's work required; and at each caster there was a device for locking the wheel when this was deemed necessary.

The evidence is sufficient to establish that Gaffney and Hill *permitted* Piping Company's employees to use Cranston's scaffold when it was not otherwise in use by Cranston. Absent both allegation and evidence that Cranston was obligated to provide a scaffold for use by Piping Company and its employees, the conclusion reached is that Cranston did nothing more than permit Piping Company and its employees to use the Cranston scaffold if they saw fit to do so.

So far as the evidence discloses, this particular scaffold was standard equipment, which defendant had purchased and had used for two years. The evidence discloses no defect therein except such as related to the casters or screws by which the wheels were locked. There is no evidence that any locking device failed to function properly at any time until after Piping Company's employees had put the scaffold in use for their purposes. Was Cranston's relationship towards plaintiff such that the law imposed upon him the legal duty to exercise reasonable care to inspect the said locking devices on the scaffold during the period the scaffold was in use by Piping Company's employees so as to cast liability upon defendant in the event such an inspection would have disclosed defects therein?

The annotation in 44 A.L.R. 932-1134, under the caption, "Liability of the contractee for injuries sustained by the contractor's servants in the course of the stipulated work," and decisions cited in the supplements, deal exhaustively with decisions in other jurisdictions, including the English cases, relating to a wide variety of factual situations. Cases are cited, including *Coughtry v. Globe Woolen Co.*, 56 N.Y. 124, 15 Am. Rep. 387, in support of the proposition that "a contractee who agreed to provide a contractor with a particular instrumentality for the purposes of the stipulated work is ordinarily liable for any injury which a servant of the contractor may sustain, during the progress of the work, by reason of a defect which was known to the principal employer, or which he might have discovered by the exercise of reasonable care, at the time when the instrumentality was turned over to the contractor." 44 A.L.R. 1048 *et seq.* Plaintiff cites *Coughtry v. Globe Woolen Co.*, *supra*, as an authority upon which he now relies. On the other hand, cases are cited in support of the proposition that "An action brought by a contractor's servant to recover for injuries caused by a defect in an instrumentality gratuitously furnished by the contractee for the purposes of the stipulated work is maintainable, or not maintainable, according as the contractee had or had not actual knowledge of the existence of the defect at the time when the transfer of the instrumentality occurred." 44 A.L.R. 1079 *et seq.* The latter statement is in accord with the text in 35 Am. Jur., Master and Servant sec. 162, and in 57 C.J.S., Master and Servant sec. 604.

In *Paderick v. Lumber Co.*, 190 N.C. 308, 130 S.E. 29, the death of plaintiff's intestate, an employee of an independent contractor, was caused by a defective "skidder" or "loader," by means of which logs were placed on railroad cars. It was held that since defendant had agreed to furnish the loader for use by the independent contractor, the liability of defendant to plaintiff's intestate, in respect of defects in the loader, rested upon principles applicable to the relationship of master

and servant. While there was no recovery in *Moore v. Rawls*, 196 N.C. 125, 144 S.E. 552, the basis of decision in the *Paderick case* was noted and the rule was restated.

In *Cathey v. Construction Co.*, 218 N.C. 525, 11 S.E. 2d 571, heard on demurrer to the complaint, there was a general contract for the construction of a residence. The general contractor constructed a scaffold. After its use by the general contractor's employees, a roofing subcontractor and its employees used the scaffold. The scaffold fell, injuring an employee of the subcontractor; and it was alleged (1) that the materials out of which the scaffold was built were of insufficient strength and defective, and (2) that an employee of the general contractor negligently and without warning removed a support from the scaffold. It was further alleged that prior to the letting of the subcontract for the roof, there had been a long course of dealing between the general contractor and the subcontractor involving similar contracts and that "it was understood between said parties, pursuant to the course of dealing between them, that the necessary scaffolds to be used in the installation of the roof on said dwelling would be furnished" by the general contractor.

In holding that the demurrer should have been overruled, this Court referred to the *Paderick case* as authority, taking occasion to point out that the relationship between defendant and plaintiff was not that of master and servant; but that where the general contractor was obligated to provide the equipment necessary for plaintiff's use the law imposed upon him a like duty with plaintiff's employer in respect of providing equipment suitable and safe for the purposes for which it was to be used.

In the excerpt from *Coughtry v. Globe Woolen Co., supra,* and in the excerpt from 27 Am. Jur., Independent Contractors sec. 30, quoted in the opinion in *Cathey v. Construction Co., supra,* as in the *Cathey case,* liability is predicated on two bases: either (1) an express obligation to provide the equipment, or (2) an implied agreement to provide such equipment as a valuable consideration and inducement to facilitate and minimize the cost of performance of the work. In both the *Coughtry* and *Cathey cases,* the defective equipment was a scaffold, allegedly built of insufficient or defective materials or workmanship, built by the defendant for use, in part at least, for the very purpose for which it was being used when plaintiff was injured.

The facts here are readily distinguishable from the cases cited. Here Cranston had a piece of equipment which Piping Company chose to use rather than provide its own equipment of similar type. Cranston interposed no objection. Cranston had neither constructed the equipment nor was it obligated to provide it. Under such circumstance, we hold

that Cranston had no duty to inspect the equipment before and during the period it permitted the use thereof by Piping Company's employees. Cranston's duty, a breach of which would render it liable, was to disclose to Piping Company and its employees such defects in the equipment, if any, of which it had actual knowledge or notice, which might render the use thereof dangerous, which were not apparent to Piping Company and its employees.

Plaintiff directs our attention to Sections 388 and 392 of the Restatement of Torts where in broad terms it is stated that the law imposes upon one who supplies to another a chattel to be used for the supplier's business purposes the duty to exercise due care to discover its dangerous character or condition, if such exists. We do not understand the authors to mean that one who permits an independent contractor or its employees to use a tool, appliance or equipment, solely as a courtesy and accommodation, is liable for failure to exercise due care to make reasonable inspection thereof before and during the period such use is permitted, simply because the ultimate result of the work to be done by the independent contractor is for the supplier's benefit and for which he must pay the independent contractor. Indeed, in explanation of Section 392, the author says: "One who employs another to erect a structure or to do other work and agrees for that purpose to supply the necessary tools and temporary structures, supplies them to the employees of such other for a business purpose. This is so irrespective of whether the structure or work when finished is to be used for business or residential and social purposes. On the other hand, if it is understood that the person who is to do the work is to supply his own instrumentalities, but the person for whom the work is to be done permits his own tools or appliances to be used as a favor to the person doing the work, the tools and appliances are supplied as a gratuity and not for use for the supplier's business purposes." The quoted explanation is not in conflict with the rule held applicable to this case.

Plaintiff cites *Martin v. Food Machinery Corp.*, 223 P. 2d 293, a decision of the District Court of Appeal, Fourth District, of California; *Hilleary v. Bromley*, 146 Ohio St. 212, 64 N.E. 2d 832, a decision of the Supreme Court of Ohio; and *Kalash v. Ladder Co.*, 34 P. 2d 481, a decision of the Supreme Court of California. In these, and in *Coughtry v. Globe Woolen Co., supra,* we find expressions more favorable to plaintiff's view than in any other cases that have come to our attention. But when the facts of each case are considered, it is apparent that decision rested upon a ground not inconsistent with the view taken by this Court.

In *Martin v. Food Machinery Corp., supra,* the plaintiff was injured when a scaffold on which he was working broke, resulting from the use

of defective materials.  Defendant-owner was constructing a building. Its employees built the scaffold and used it in their construction work. Plaintiff was an employee of a subcontractor, who was doing the outside lathing and plastering on a cost-plus basis.  The evidence disclosed that it was the custom for tradesmen and workmen, when following one another, to use the scaffold already constructed.  Whether plaintiff was an invitee, under the facts presented, was held for determination by the jury.  It is noted that in the *Martin case,* as in the *Coughtry* and *Cathey cases,* a stationary scaffold, constructed by the defendant, was involved, not a movable piece of equipment such as the scaffold owned by Cranston.

In *Hilleary v. Bromley, supra,* the second paragraph of the "Syllabus by the Court," states the basis of decision as follows: "2. Where a person agrees to place siding on a house and enters into a subcontract with another whereby the latter is to apply the siding and the former to supply ladders to be used in such work, such supplying is a bailment for the mutual benefit of the parties and the bailor is bound to exercise ordinary care in making the ladders safe for their intended purpose or to disclose to the bailee such defects in the ladders as it was the bailor's duty, in the exercise of ordinary care, to discover."

In *Kalash v. Ladder Co., supra,* the action was against the manufacturer of a ladder which collapsed while plaintiff was at work thereon in his employer's business.  The principles applicable to a manufacturer of equipment as set forth in the leading case of *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696, Ann. Cas. 1916C, 440, were applied.

Even where the relationship is that of master and servant, and the duty devolves upon the master to exercise due care to inspect at reasonable intervals, tools, appliances and equipment furnished by him to his servant for the performance of his work (*Womble v. Grocery Co.,* 135 N.C. 474, 47 S.E. 493; *West v. Tanning Co.,* 154 N.C. 44, 69 S.E. 687; *Cotton v. R. R.,* 149 N.C. 227, 62 S.E. 1093), such duty does not apply to a simple tool, such as a hammer, axe, chisel, spade, etc., because "the employee, by using the tool, has had the opportunity to observe defects, and . . . his knowledge is equal or superior to that of the employer." *Mercer v. R. R.,* 154 N.C. 399, 70 S.E. 742.  The reason underlying the rule relating to simple tools applies equally when the servant discovers that, unknown to his master, an appliance or equipment has become defective in the course of his use thereof, unless he makes such defect known to his employer so that the defect may be repaired or a new appliance or new equipment furnished or so that the master may instruct the servant to desist from further use of the defective appliance or equipment.

The relationship between Cranston and plaintiff was not that of master and servant. But in no aspect of the case would Cranston's liability to plaintiff be greater than if such were their relationship.

If plaintiff's evidence is accepted, plaintiff, in the course of his use of the scaffold, actually discovered the alleged defective condition of one or more of the casters or screws used therewith. His actual knowledge of the repeated failure of the locking device on one or more of the wheels was based on his personal experience with and use of the scaffold. When a person has knowledge of a dangerous condition, a failure to warn him of what he already knows is without significance. *Perry v. Herrin*, 225 N.C. 601, 35 S.E. 2d 883; *Presley v. Allen & Co.*, 234 N.C. 181, 66 S.E. 2d 789. Here plaintiff alleges that the very defective condition of which he was fully aware was the proximate cause of his injury.

It is apparent that plaintiff's knowledge of the alleged defective condition of the scaffold was superior to that of Cranston. Indeed, Cranston had no knowledge thereof. Evidence of notice to Philpott, the storeroom keeper, and to Hunsinger, the steam-fitter's helper, rather than to Gaffney or Hill, whom plaintiff alleges were in charge of Cranston's equipment, including the scaffold, was not notice to Cranston. Too, the fact that Piping Company, plaintiff's employer, knew of the alleged defective condition, was not chargeable to Cranston.

It is further noted that there is no evidence that the locking device failed or that the scaffold rolled at any time when the equipment was used by persons other than Piping Company's employees, plaintiff and his co-workers.

In *Deaton v. Elon College*, 226 N.C. 433, 38 S.E. 2d 561, the plaintiff's intestate was an independent contractor. Judgment of nonsuit was affirmed. What is said by *Barnhill, J.* (now *C. J.*), is appropriate here: "The owner is not responsible to an independent contractor for injuries from defects or dangers of which the contractor knew or should have known, 'but if the defect or danger is hidden and known to the owner, and neither known to the contractor, nor such as he ought to know, it is the duty of the owner to warn the contractor, and if he does not do this he is liable for resultant injury.' (Citations omitted.)"

According to plaintiff's testimony, Piping Company's employees, including plaintiff, shortly before plaintiff's injury, removed the brace on the scaffold adjacent to the heater on which they were working. Defendant contends with much force that the removal of this brace, considered with the weight and position of the workmen and the steel plate, so weakened the scaffold and platform that it should be inferred that they became unsteady or shifted, causing plaintiff to lose his balance; and that any further movement of the scaffold was incident to the fall

of plaintiff and of Cagle from the platform. Obviously, there was some movement of the scaffold or platform. Plaintiff and Ferguson testified that it *rolled*. However, it was physically impossible for them to see the casters or wheels from where they were standing on the scaffold, then holding and placing the steel plate against the heater.

Plaintiff's testimony is direct and positive that the bolts were tightened and the wheels locked before plaintiff and his fellow-employees went upon the scaffold on this occasion. After the accident, no inspection was made to determine whether the threads on any cap screw were worn or stripped or whether any wheel was then unlocked. On the contrary, Cagle testified that he continued to use the scaffold, without alteration, for two weeks after the accident, during which time he had no trouble with the locking device. However, since we have reached the conclusion that the judgment of involuntary nonsuit should be affirmed on the basis of the legal principles declared above, we need not decide whether the testimony of plaintiff and Ferguson, considered in relation to the physical facts and undisputed evidence, is sufficient to support the plaintiff's allegation and theory of the case, namely, that the locking device failed and the scaffold *rolled*.

The court excluded a telegram and certain letters. These tend to show that from September, 1951, until Piping Company's employees got on the job in late January of 1952, Sirrine & Company, prodded by Cranston, had been urging Piping Company to go ahead with the work. However, as plaintiff frankly admits in his brief, these letters were offered solely for the purpose of showing that Cranston wanted the work to proceed as rapidly as possible. Admitted evidence tends to establish this fact. For that matter, in the salubrious but chilly air of Fletcher, North Carolina, in mid-winter, Cranston's desire that the deficiencies in its heating system be remedied without delay is obvious. The exclusion of these exhibits does not affect decision as to nonsuit.

It appears that plaintiff received serious personal injuries while in the employment of Piping Company. He was entitled to compensation benefits. He has received the compensation to which he was entitled under the Workmen's Compensation Act. No doubt the amount thereof was inadequate compensation for his injuries. Even so, we find no evidence in this record sufficient to impose liability upon Cranston for the unfortunate accident. Hence, the judgment of involuntary nonsuit is

Affirmed.