**James Mark SEXTON and Amelia H. Sexton, Plaintiffs,**

v.

**UNITED STATES of America, Defendant and Third–Party Plaintiff,**

v.

**ELLIS–WALKER BUILDERS, INC., Third–Party Defendant.**

No. 88–116–CIV–3–H.

United States District Court, E.D. North Carolina, Fayetteville Division.

April 18, 1991.

Rodney A. Guthrie, Russ, Worth, Cheatwood & Guthrie, Fayetteville, N.C., Susan K. Burkhart, Patterson, Dilthey, Clay, Cranfill, Sumner & Hartzog, Raleigh, N.C., for plaintiffs.

Richard B. Conely, Sr., Asst. U.S. Atty., for the U.S.

Richard M. Wiggins, McCoy, Weaver, Wiggins, Cleveland & Raper, Fayetteville, N.C., for Ellis–Walker Builders, Inc.

## ORDER

MALCOLM J. HOWARD, District Judge.

This matter is before the court for decision after a bench trial held on January 28–30, 1991, in Fayetteville, North Carolina. Closing arguments were made by counsel on Friday, February 1, 1991. Having heard the evidence presented at trial and having reviewed all exhibits, the court now rules in favor of the plaintiff James Mark Sexton in the total amount of $972,218.00 and in favor of the plaintiff Amelia H. Sexton in the total amount of $100,000.00.

## STATEMENT OF THE CASE

On November 23, 1988, plaintiffs instituted the case at bar against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq., alleging that plaintiff James Mark Sexton ("Sexton") received serious and permanent injuries when he stepped on a metal grate located on the grounds of the Womack Army Hospital and fell through the grate to a subterranean pit during a construction project at the hospital. Plaintiffs initially contend that Mark Sexton was a business invitee during the work at the hospital.

Plaintiffs contend that defendant United States, as owner of the grate in question, owed to plaintiff Mark Sexton, as a business invitee, a duty of due care in insuring that the premises were in a reasonably safe condition. Plaintiffs allege that defendant was negligent in the design, construction, and maintenance of the grate covering through which plaintiff fell, proximately causing serious and permanent injuries to plaintiff.

Plaintiffs further allege that defendant was actively and grossly negligent in the design, construction, and maintenance of the grate in that it had notice that the grate in question was designed improperly and was maintained improperly and that such situation constituted an undue hazard and risk of injury to the plaintiff and others similarly situated. Plaintiffs further allege that as a direct result of injuries sustained by plaintiff Mark Sexton, plaintiff Amelia Sexton (now Huckenpahler) suffered the loss of society, companionship, kindly offices, love, care, and affection of her husband, Mark Sexton, which resulted in the deterioration of their relationship and ultimate termination of their marriage.

At the conclusion of the trial plaintiff Mark Sexton asserted a claim for damages in the amount of $1,717,881, and plaintiff Amelia Sexton asserted a claim for damages in the amount of $350,000 for loss of consortium.

Great American Insurance Company ("Great American"), a party in interest, asserts a lien against any recovery by plaintiff Mark Sexton for Workers' Compensation benefits paid to plaintiff on behalf of plaintiff's employer, J.J. Barnes, Inc. At the beginning of the trial, Great American had paid Workers' Compensation benefits to plaintiff in the total amount of $265,636.63. Great American contends that since the evidence shows no negligence on the part of the employer J.J. Barnes, Great American is entitled to recover all benefits paid to plaintiff.

Great American further argues that since the government had the complete right of control of the grate premises, and the defect in the grate was a latent defect, J.J. Barnes cannot be held liable for plaintiff's injuries. Lastly, Great American argues that J.J. Barnes can only be held

liable if it had notice of the defect in the grate. Great American contends that because J.J. Barnes had no notice of the defect, it cannot be liable for plaintiff's fall.

Defendant and third-party plaintiff United States initially argues that the court lacks subject matter jurisdiction over plaintiffs' claims. The government contends that plaintiffs' claims are barred by the discretionary function exception of the Federal Tort Claims Act in that defendant, by contract, delegated all safety requirements to the third-party defendant Ellis–Walker Builders, Inc. ("Ellis–Walker"); therefore, defendant cannot be held liable for any negligence in the present case.

Defendant United States contends that Ellis–Walker failed to provide a safe working environment to the plaintiff as he performed his duties in connection with the construction project at Womack Army Hospital. Defendant asserts claims for indemnity and contribution against Ellis–Walker.

Defendant further argues that plaintiff Mark Sexton's employer, J.J. Barnes, failed to provide a safe working environment for plaintiff. Lastly, defendant contends that plaintiff Mark Sexton was contributorily negligent in that he received adequate warnings as to the hazard of the grate area but ignored such warnings and failed to maintain a proper lookout in walking across the grate area.

Third-party defendant Ellis–Walker argues that the scuttle door at issue in the case at bar was constructed so that it was inadequately supported within the grating and thus posed a hazard. Ellis–Walker contends that the government had knowledge of the existing danger in the inadequately supported scuttle door but failed to warn Ellis–Walker of such danger. Ellis–Walker acknowledges that the government contracted with it to provide a safe job site for the performance of the contract but argues that the grating area was not within the job site; therefore, Ellis–Walker cannot be held liable for plaintiff's injuries.

## FINDINGS OF FACT

1. On September 19, 1984, Ellis–Walker Builders, Inc., following solicitation by the United States Army Corps of Engineers ("Corps of Engineers"), offered to perform interior repairs at Womack Army Hospital, Fort Bragg, North Carolina, a facility owned, operated, and under the control of the United States of America.

2. Contract No. DACA21–84–C–0103, which was the contract to perform the interior repairs at Womack Army Hospital, was awarded to Ellis–Walker by the Corps of Engineers on September 26, 1984.

3. The scope of the work included repairs to the heating and plumbing systems of the hospital. Such work included welding in the basement of the hospital, and Ellis–Walker subcontracted that work to J.J. Barnes, Inc.

4. On May 7, 1985, plaintiff James Mark Sexton was in the employment of J.J. Barnes as a welder.

5. As of May 7, 1985, the employees of J.J. Barnes had been working inside the basement area of Womack Army Hospital for approximately two to three months. As of May 7, 1985, Mark Sexton had been a welder at the job site for approximately two weeks.

6. A door in the basement of the hospital led into a subterranean mechanical pit located outside and adjacent to the hospital and approximately fourteen feet below ground level. The top of the mechanical pit was covered with large grates adjacent to the exterior wall of the hospital. The grates had access or scuttle holes which were covered by scuttle doors made of the same grating material and measuring approximately 30 inches square. The scuttle doors gave access to fixed vertical ladders which descended to the floor of the mechanical pit. The scuttle door at issue in this matter was supported by metal flanges (also referred to as "lips") on two opposing ends; and when properly seated, rested on the flanges flush with the rest of the grate. At the end nearest the ladder located beneath the scuttle door was a piece of aluminum angle material attached to an angle iron. The aluminum angle material was intended to keep the door from moving about.

7. The scuttle door involved in this matter had no markings, warnings, or barri-

cades showing the existence or location of the same.

8. After J.J. Barnes began to do its work on the subcontract with Ellis–Walker, a diesel-powered welding machine was placed on the ground level near the grating area, and welding leads were run through an opening in the grating area close to the scuttle door. The leads were run down into the subterranean mechanical pit area. The welding machine was owned by J.J. Barnes and had to be placed outside due to noxious fumes created by the machine. The machine had to be placed on a grassy area near the hospital's entrance because it could not be placed on a nearby firelane or on the sidewalk parallel to the grating area.

9. On May 7, 1985, at some time shortly before 6:00 p.m., plaintiff Sexton left his work station in the basement of the hospital with the intention of going to the welding machine to adjust the heat of the machine. He left the basement by way of a staircase that led to the outside ground level. Plaintiff did not leave the basement by way of the scuttle door which led into the subterranean pit. After exiting the basement, plaintiff walked in a direct line towards the welding machine. This line took him across the grating over the concrete lined mechanical pit. As plaintiff crossed over, stepping on the scuttle door at issue, the door gave way, causing plaintiff and the scuttle door to fall to the concrete floor of the subterranean pit fourteen feet below.

10. A few minutes after plaintiff had departed from the basement to adjust the welding machine, Oscar Parker, an employee of J.J. Barnes, discovered plaintiff in the subterranean room in an unconscious and injured state. The scuttle door was also found in the subterranean room. Plaintiff's hard hat was discovered on the grate cover over the pit.

11. As a direct and proximate result of Sexton's fall, he suffered serious permanent injuries including:

a. A closed head injury with frontal lobe damage;

b. Total loss of vision in his left eye;

c. A fractured left wrist with 10% permanent disability;

d. Six broken ribs;

e. A punctured left pneumothorax;

f. Broken teeth;

g. Lacerations on his nose, legs and eyes; and

h. Multiple bruises and contusions.

12. The plans and specifications for the construction of Womack Army Hospital, which was completed during the 1950's, show a *hinged* scuttle door at the location where the injury occurred.

13. The scuttle door was designed, constructed, and maintained by the United States in such a way that:

a. The scuttle door lacked sufficient side supports (flanges or lips);

b. The scuttle door was not hinged to insure that it was properly seated when closed as called for by the original plans and specifications and as required by general construction industry standards;

c. The scuttle door lacked markings, signs, barricades, or other means of distinguishing the door from the surrounding grating so as to give notice of its existence or location; and,

d. The scuttle door tended to blend into the surrounding grate covering.

14. The above defects proximately caused the scuttle door to fall, along with plaintiff, as plaintiff walked over the door on May 7, 1985.

15. The above-stated defects of the scuttle door in question were not so obvious or apparent as to put plaintiff Sexton or any agent or employee of J.J. Barnes or Ellis–Walker on notice of such defective condition.

16. The above-stated defects were latent defects.

17. During their welding work in the basement of the hospital, J.J. Barnes' employees stored pipes for their work in the subterranean pit area.

18. Prior to Mark Sexton's fall, Doug West, the foreman of the night crew for J.J. Barnes, removed the scuttle door at issue to place pipes for the welding work in the subterranean pit area. Mr. West re-

moved the door two to three days prior to plaintiff's fall and accidentally dropped the door into the pit due to the heaviness of the door. Russell Price, an employee of the Corps of Engineers and the Quality Assurance Representative,[1] knew that J.J. Barnes' employees were using the pit area for the storage of pipes.

19. Prior to Mark Sexton's fall, Buddy Clark, a job supervisor with J.J. Barnes,[2] removed the scuttle door at issue in the present case to place pipes down into the pit area for the welding work in the basement. He instructed J.J. Barnes' employees not to use the scuttle door for ingress or egress and only to use the door for the purpose of placing pipes down into the pit.

20. As instructed by their supervisors, J.J. Barnes' employees did not use the scuttle door for ingress or egress and only used the door to place pipes into the subterranean pit.

21. On May 7, 1985, Larry Rosser was employed by J.J. Barnes as a welder's assistant and was assisting plaintiff Mark Sexton. Prior to Mark Sexton's accident, Mr. Rosser walked over the scuttle door in question ten or more times. On one occasion when he walked over the door, the door fell down into the subterranean pit. Mr. Rosser did not fall into the pit but cut his ankle. He did not tell anyone about this incident, including Ellis–Walker's employees or agents, J.J. Barnes' employees or agents, or plaintiff Mark Sexton.

22. No Ellis–Walker or J.J. Barnes employee or agent knew or had reason to know that the scuttle door had moved on the flanges of the surrounding grate area so as to allow it to fall to the pit below.

23. No Ellis–Walker or J.J. Barnes employee or agent, other than Larry Rosser, knew or had reason to know that the scuttle door posed any hazard or risk to any person who was walking across the grate area.

24. No J.J. Barnes employee, including Larry Rosser, informed Gordon Haire, the Field Supervisor in charge at J.J. Barnes, or any other J.J. Barnes supervisor that the scuttle door posed any safety hazard.

25. No Ellis–Walker or J.J. Barnes employee or agent had actual or constructive knowledge of any design or other defects in the scuttle door.

26. Neither J.J. Barnes nor Ellis–Walker was reasonably required to discover any danger or hazard posed by the scuttle door because such defects were hidden from view, and certain persons, including United States' employees and agents, had frequently walked across the grate area.

27. Defendant United States knew or should have known of the dangerous or hazardous condition which existed in the subject grate and scuttle door yet failed to correct the condition and failed to warn plaintiff Mark Sexton, J.J. Barnes' employees or agents, or Ellis–Walker's employees or agents of the same. Specifically, the plans and specifications for the construction of Womack Army Hospital show a *hinged* scuttle door at the location where plaintiff's fall occurred, yet there were no hinges on the door. General construction industry standards require that such scuttle doors be hinged. Defendant United States placed hinges on scuttle doors in the vicinity of the scuttle door at issue but did not place any hinges on the door through which plaintiff fell on May 7, 1985. The scuttle door involved in the present case was located approximately five feet from the main entrance of Womack Army Hospital, a heavily traveled area.

28. Plaintiff Mark Sexton is presently 39-years-old.

29. As of the date of trial, plaintiff Mark Sexton, as a direct and proximate result of his injuries suffered on May 7, 1985, has incurred medical expenses totalling $162,218.

30. Plaintiff Mark Sexton, as a direct and proximate result of his injuries suffered on May 7, 1985, has been unable to

---

1. A Quality Assurance Representative insures that the government obtains the quality of products or services for which it contracts and also has duties pertaining to safety during construction projects.

2. Mr. Clark testified that a job supervisor basically has the same duties as a foreman. He testified that he was in charge of the day crew.

engage in gainful employment since May 7, 1985, through the date of trial.

31. As of May 7, 1985, Sexton had been earning $9.45 per hour as a welder with J.J. Barnes. He worked a forty hour week. He had also been teaching welding courses at Fayetteville Technical Institute for six months. He taught around twelve hours per week at $10.00 per hour.

32. As of May 7, 1985, Sexton had generally been continuously employed in the construction field. If he was laid off from a construction job, such lay off was usually due to a lack of work. Following a lay off, he usually obtained employment a short time thereafter, such as a few days.

33. Sexton will be able to obtain gainful employment at some point in the future. His injuries will prevent him from doing certain jobs, such as welding. He has difficulty acquiring new information and has difficulty with interpersonal relationships. It is believed, however, that he may be able to work in a building trade or in machinery repairs.

34. Plaintiff has suffered diminished earning capacity, pain and suffering, and a permanent loss of use of portions of his body, including his left eye, left wrist, and brain function. Sexton will not be able to return to full-time, gainful employment for at least four years. Even then, the court considers that his earning capacity will be diminished by at least 15 per cent.

35. Following his fall on May 7, 1985, Sexton has experienced problems with explosive outbursts, temper tantrums, rigidity of thought, and difficulties with language skills. His fine motor performance has been impaired. He has had problems with attention span, memory loss, and inability to review vocational goals. All of these difficulties are indicative of problems associated with a closed head injury. As far as brain damage, Sexton has been diagnosed as permanently "mildly impaired." Sexton has undergone in-depth psychological counseling and rehabilitation. Such counseling and rehabilitation have helped him improve in some of the problem areas stemming from his closed head injury. He has improved in the areas of memory loss, attention span, and motor skill problems. He has not been, and will not in the future be, returned to his mental state prior to the May 7, 1985, fall. Sexton has had to undergo psychiatric counseling and hospitalization for threats of violence directed towards people and property and for substance abuse. He has improved in these areas. Some problems still remain. Sexton has difficulty processing new information and with self-evaluation. He still has problems with higher order language skills. Deficits in the areas of math and writing still need to be resolved before he will be able to seek employment.

36. Prior to the accident on May 7, one of Sexton's favorite hobbies was golf. He has been unable to play golf since his fall due to his injuries.

37. As a direct and proximate result of his injuries, Sexton will require future psychological and vocational counseling in the amount of $10,000.

38. The North Carolina Mortuary Table, N.C.G.S. § 8–46, provides that a person with a completed age of 39 has a life expectancy of 34.17 years. Considering the mortuary table and Sexton's age, health, constitution, and habits, the court finds his life expectancy to be 34.17 years.

39. On May 7, 1985, plaintiff Amelia Sexton Huckenpahler was the wife of Mark Sexton. As a direct and proximate result of the injuries suffered by Mark Sexton on May 7, 1985, plaintiff Amelia Sexton suffered a severe deterioration of her marital relationship with Mr. Sexton. Amelia and Mark Sexton were married on January 31, 1971. The couple had two children, a son and a daughter. Mrs. Sexton described her husband as her best friend and a good father to their children. He was never physically abusive prior to the accident. Mark Sexton showed affection and tenderness towards his family. The couple had friends and visitors in their home. Following Mark Sexton's fall on May 7, 1985, his personality drastically changed. The couple had no social life and never did anything together. Mark Sexton showed much anger at even small annoyances and became physically abusive towards Amelia

Sexton and their children. For example, he broke Amelia Sexton's nose and tried to choke his daughter because he wanted her to do the laundry, but the daughter was involved in something else at the time. Mark was not a violent, abusive person prior to his accident. Amelia Sexton requested a separation in 1987 due to fear for the physical well-being of her children and herself. Mark's drastic personality change ultimately led to Mark and Amelia Sexton's divorce on February 17, 1989.

40. As a direct and proximate result of his injuries suffered on May 7, 1985, plaintiff Mark Sexton is entitled to recover from defendant United States the following amounts as damages:

(A) *Medical Expenses:* $162,218.00;

(B) *Lost Income:* The court finds that Mark Sexton is entitled to $200,000.00 as fair compensation for loss of earnings which are the immediate and necessary consequences of his injury, determined as follows:

As of May 7, 1985, Mark Sexton was basically earning approximately $20,000.00 per year from employment. Prior to the injury, Sexton had the capacity to earn at least this amount throughout his life expectancy. The court considers that this amount could increase each year due to growth. The court finds that Sexton will not be able to return to full-time, gainful employment for at least four years; and thereafter, his future earning capacity will be diminished at least 15 per cent.

The court finds that Sexton is entitled to $100,000.00 as fair compensation for loss of past earnings as the proximate result of the negligence of the defendant, United States of America.

The court finds that Sexton is entitled to $100,000.00 as fair compensation for loss of future earnings as a proximate result of the negligence of the defendant, United States of America. In arriving at this amount of future loss of earnings, the court has considered Sexton's life expectancy and has determined what is fair compensation for his loss of future earnings during his life. The court has reduced the amount allowable as future damages to its present worth.

(C) *Future Psychological and Vocational Counseling:* $10,000.00. The court finds that Mark Sexton is entitled to $10,000.00 as fair compensation for future psychological and vocational counseling which is the immediate and necessary consequence of his injury. In arriving at this amount of future medical expense, the court has considered Sexton's life expectancy and has determined what is fair compensation for his damages during his life. The court has reduced the amount allowable as future damages to its present worth.

(D) *Physical Pain and Suffering:* The court finds that Mark Sexton is entitled to $600,000.00 as fair compensation for the actual physical pain and mental suffering which are the immediate and necessary consequences of the injury. In determining this amount, I have included an award of $300,000.00 as fair compensation for the prospective physical pain and mental suffering which are the proximate result of the negligence of the defendant, United States of America. In arriving at this amount of future pain and suffering, the court has considered Sexton's life expectancy and has determined what is fair compensation for his damages during his life and has reduced the amount allowable as future damages to its present worth.

*Total Damages:* $972,218.00.

41. Plaintiff Amelia Sexton (Huckenpahler) is entitled to recover from defendant United States damages in the amount of $100,000 for loss of consortium. Such damages are awarded for loss of consortium from May 7, 1985, until February 17, 1989.

42. As of the date of trial, Great American has paid Workers' Compensation benefits to plaintiff Mark Sexton on behalf of Sexton's employer, J.J. Barnes, in the total amount of $265,636.63.

43. Great American is entitled to a lien on plaintiff Mark Sexton's recovery in the amount of $265,636.63 until the lien is satisfied.

## DISCUSSION

This case presents a host of thorny legal issues. This section contains the rationale for the conclusions of law adopted by the court in Part Three.

### A. Discretionary Function Exception

■ Initially, defendant United States argues that the court lacks subject matter jurisdiction over the present action on the grounds that plaintiffs' claims are barred by the discretionary function exception of the Federal Tort Claims Act. 28 U.S.C. § 2680(a). For the reasons discussed below, the court finds defendant's argument to be without merit.

The Federal Tort Claims Act ("FTCA") confers exclusive jurisdiction upon federal district courts over civil actions caused by the negligent or wrongful act or omission of any employee of the United States acting within the scope of his or her office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). An exception to the government's waiver of sovereign immunity in the FTCA is the discretionary function exception. The discretionary function exception, which is contained in 28 U.S.C. § 2680, states as follows:

> The provisions of this chapter and section 1346(b) of this title shall not apply to: (a) Any claim based upon an act or omission of an employee of the Government, exercising due care ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion be abused.

In *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the seminal Supreme Court case construing the exception, the Court held:

> that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities.

> It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion.

346 U.S. at 35–36, 73 S.Ct. at 968.

Moreover, "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *United States v. Varig Airlines*, 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). The "basic inquiry ... is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." *Id.* at 813, 104 S.Ct. at 2764.

The discretionary function exception "protects only governmental actions and decisions based on consideration of public policy." *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988). It "insulates the Government from liability if the action challenged ... involves the permissible exercise of policy judgment." *Id.* at 537, 108 S.Ct. at 1959. Courts may not "second-guess the political, social, and economic judgments of an agency exercising its regulatory function." *United States v. Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2768.

Defendant United States argues that it exercised its discretion in allowing the general contractor, Ellis–Walker, to assume responsibility for the safety of the job site, including the grate area, and thereby contracted away any duty the government may have had to plaintiff Mark Sexton. Defendant further argues that it exercised discretion in choosing the manner in which the scuttle door would be secured and in supervising the safety procedures utilized by Ellis–Walker. Defendant argues that such acts are covered by the discretionary function exception.

In *Camozzi v. Roland/Miller and Hope Consulting Group, Joint Venture*, 866 F.2d 287 (9th Cir.1989), the court dealt with facts strikingly similar to the facts in the

case at bar. Camozzi and Lessnau[3] were employees of the general contractor involved in the construction of a postal facility. Camozzi, a cement mason, fell through an unguarded opening in metal decking on the second floor and sustained serious injuries. Lessnau was injured in the same manner the next day. The government argued that the postal service had delegated its responsibility for worker safety to the contractor, and in doing so exercised a discretionary function excepted from the FTCA.

As in this case, the contract in *Camozzi* required the contractor to "take proper safety and health precautions to protect the work, the workers, the public, and the property of others." The contractor had to comply with the Occupational Safety and Health Act of 1970. The U.S. Postal Service could cancel the contract for failure to comply with health and safety standards.

The Ninth Circuit rejected the government's argument that the plaintiffs' claims were barred by the discretionary function exception. The court pointed out that the plaintiffs did not base their claims on the fact that the postal service contracted with the general contractor for the performance of safety functions during construction. *Id.* at 289. Rather, plaintiffs based their claims on the negligence of the postal service in discharging its authority to police the contractor's compliance with safety standards. *Id.* The *Camozzi* court held that the negligent failure of the postal service to discover the floor openings through which plaintiffs fell did not fall involve the permissible exercise of policy judgment and therefore did not fall within the discretionary function exception. *Id.*

In the case *sub judice*, as in *Camozzi*, plaintiffs do not base their claims on the government's delegation of responsibilities for worker safety to Ellis–Walker. It is clear that the actual decision to delegate worker safety responsibilities does involve discretion and policy judgments and is therefore encompassed within the discretionary function exception. Plaintiffs' claims, however, are based on the govern-

ment's negligent design, construction, and maintenance of the grate covering in question. Such acts do not involve policy judgments or discretion and are not covered by the discretionary function exception. *See Camozzi*, 866 F.2d at 289–290.

The government argues that it delegated to Ellis–Walker all responsibilities for worker safety; and therefore, any defects in the grate were the responsibility of Ellis–Walker to discover and correct. As the court in *McGarry v. United States*, 549 F.2d 587, 591 (9th Cir.1976), *cert. denied*, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977), this court "question[s] whether the government can administratively immunize itself from tort liability under applicable state law as a matter of 'policy' ".... It is unnecessary for the court to address this issue, however, based on the fact that the government's acts do not fall within the discretionary function exception.

In the case at bar, the contract between the government and Ellis–Walker contained provisions requiring the contractor to take reasonable precautions to protect the health and safety of employees, yet the government reserved the right to inspect the contractor's activities and to halt any and all work if safety precautions were not being enforced. Thus, the government did not dissociate itself from all matters of safety or disclaim all concerns in that regard. As a matter of policy, the government chose to retain responsibilities over matters of employee safety. *See McGarry v. United States*, 549 F.2d at 591. The failure of the government to fulfill these retained safety obligations under the contract was one of plaintiffs' claims, and such acts or omissions of government employees or agents in performing such retained safety obligations did not involve policy judgments and therefore were not excluded from the FTCA by § 2680(a).

## B. *Business Invitee*

■ This court must next determine plaintiff Mark Sexton's relationship to defendant United States and what duty, if

---

**3.** Plaintiffs whose cases were consolidated.

any, defendant, as owner of Womack Army Hospital, owed to plaintiff.[4] It is well settled in North Carolina that a contractor and his employees who go upon the premises of the owner, at the owner's request, are invitees. *Spivey v. Babcock & Wilcox Co.,* 264 N.C. 387, 388, 141 S.E.2d 808, 810 (1965). The owner therefore owes a duty of due care under all the circumstances to the contractor and the contractor's employees. *Id.*

As explained in *Deaton v. Board of Trustees of Elon College,* 226 N.C. 433, 38 S.E.2d 561 (1946), the general rule is as follows:

> The owner is not responsible to an independent contractor for injuries from defects or dangers of which the contractor knew or should have known, "but if the defect or danger is hidden and known to the owner, and neither known to the contractor, nor such as he ought to know, it is the duty of the owner to warn the contractor, and if he does not do this he is liable for resultant injury."

226 N.C. at 438, 38 S.E.2d at 565.

■ It is also well settled that the employee of a subcontractor working for a general contractor is an invitee in relation to the general contractor. *Wellmon v. Hickory Construction Co., Inc.,* 88 N.C.App. 76, 80, 362 S.E.2d 591, 593 (1987), *cert. denied,* 322 N.C. 115, 367 S.E.2d 921 (1988). Both the general contractor and the owner of the premises owe to the subcontractor and its employees the duty· of ordinary care. *Langley v. R.J. Reynolds Tobacco Co.,* 92 N.C.App. 327, 329, 374 S.E.2d 443, 445 (1988), *cert. denied,* 324 N.C. 433, 379 S.E.2d 241 (1989). The duty of ordinary care involves keeping that portion of the premises designed for the invitee's use in a reasonably safe condition so as not to expose him unnecessarily to danger. *Wrenn v. Hillcrest Convalescent Home, Inc.,* 270 N.C. 447, 448, 154 S.E.2d 483, 484 (1967).

■ If a peril is hidden or unsafe conditions exist, and the landowner has actual or constructive knowledge of such conditions, he has a duty to give a warning to the affected invitees. *Long v. Methodist Home for the Aged, Inc.,* 281 N.C. 137, 139, 187 S.E.2d 718, 720 (1972). The owner is not under a duty to warn an invitee of a danger or condition which is obvious, *Sellers v. Vereen,* 267 N.C. 307, 309, 148 S.E.2d 98, 100 (1966), or of which the invitee has equal or superior knowledge. *Wrenn v. Hillcrest Convalescent Home, Inc.,* 270 N.C. at 448, 154 S.E.2d at 484.

■ The court will next apply the above-stated principles to the facts of the case at bar. As stated in the "Findings of Fact" section, the scuttle door at issue had a number of design deficiencies. First, the door lacked hinges, even though the original plans of the grate construction called for hinges. The industry standards for constructing a grate covering with a scuttle door is to add hinges to the door. The scuttle door lacked sufficient side supports (flanges or lips). The door could be removed and then replaced in such a way that there would be a gap at one end of the door measuring approximately ⅛″ to ¼″. These design deficiencies proximately caused the scuttle door to fall into the pit when plaintiff walked over the door on May 7, 1985.

The door could also be removed and replaced in such a way that it would not be properly seated. However, the fact that the door was improperly seated would not be apparent to an observer or to a person walking over the scuttle door. In fact, the door would appear to be properly seated. The design deficiencies of the scuttle door were therefore latent defects.

As stated previously, the original plans for construction of Womack Army Hospital required that hinges be placed on the subject scuttle door, yet there were no hinges on the door on the date of plaintiff's accident. The United States placed hinges on other scuttle doors on the military base where Womack Army Hospital was located, yet it did not place any hinges on the door involved in this case even though the door was located approximately five feet from the main entrance of the hospital, an area

---

**4.** As explained above, the substantive law of North Carolina applies in the case at bar.

that would be heavily traveled by persons of all ages. Defendant United States knew or should have known of the design deficiencies of the scuttle door involved in the case at bar.

Since the deficiencies were latent and not obvious, and the United States had actual or constructive knowledge of such defects, the government had the duty to warn both Ellis–Walker and plaintiff, invitees of the government, of these defects. The government was negligent and breached its duty of ordinary care when it failed to warn Ellis–Walker or plaintiff Mark Sexton of these defects. In fact, government employees and agents used the scuttle door for access into the subterranean pit area and were aware that J.J. Barnes' employees were utilizing the pit area to store pipes, but did not warn such employees of the dangerous condition of the door and did not warn Ellis–Walker or J.J. Barnes' employees not to use the door. Because the United States did not warn Ellis–Walker, J.J. Barnes, or plaintiff of the latent defects of the grate, and such defects proximately caused the scuttle door to fall into the pit area when plaintiff walked over it on May 7, 1985, defendant United States is liable for plaintiff's resultant injuries.

■ Defendant United States argues that it delegated to Ellis–Walker the duty to maintain the safety of the job site and that Ellis–Walker was negligent in failing to inspect the scuttle door and discover any defects. It is true that Ellis–Walker contracted with the United States to maintain safety during the construction project. Ellis–Walker was required to adhere to the Corps of Engineers' Safety Manual, to hold weekly safety meetings for its employees and the supervisors of subcontractors, to report safety hazards, and to obey all OSHA regulations and federal, state, and municipal laws.

This court finds, however, that Ellis–Walker's safety obligations did not reasonably include inspecting a scuttle door to discover if there were any design deficiencies. There were no barricades or other warnings not to use or walk over the scuttle door. The door was located a short distance from the main entrance of Womack Army Hospital. It certainly would have been a safety obligation of Ellis–Walker to make certain that the welding machine used by J.J. Barnes was properly grounded, but it would not have been a reasonable requirement to inspect a scuttle door in a pre-existing grate for hidden (latent) defects. There was no evidence that any Ellis–Walker employee or agent was negligent in any way. Thus, Ellis–Walker did not breach its duty of ordinary care to plaintiff Mark Sexton, an invitee of Ellis–Walker, the general contractor.

The government further argues that J.J. Barnes' employees negligently removed the scuttle door and improperly placed it, proximately causing the door to fall into the pit area when plaintiff walked over it. This court finds, however, that there was no evidence that J.J. Barnes' employees or agents were negligent in any way. Government employees or agents knew that J.J. Barnes was using the pit area to store pipes. Government agents or employees made daily inspections of the work site and had to have seen the welding leads running through a hole in the grating area down into the pit, yet such agents or employees failed to warn J.J. Barnes not to use the scuttle door.

As explained above, the design defects were latent and would not have been obvious to J.J. Barnes' employees. Both Doug West and Buddy Clark, foremen for J.J. Barnes, noticed one hazard of the grate—that the scuttle door at issue was very heavy when they removed it to place pipes into the pit area. Doug West testified that he even dropped the door down into the pit area 2–3 days prior to plaintiff's fall due to the weight of the door. Because of the heaviness of the door, Mr. West and Mr. Clark guarded against injury by informing J.J. Barnes' employees not to use the door for ingress or egress and only to use the door to place pipes into the pit area. J.J. Barnes' employees followed the warnings of their supervisors and did not use the door for ingress or egress into the basement area.

Larry Rosser, who was employed by J.J. Barnes as a welder's assistant on the date of Mark Sexton's fall, testified that he had walked over the scuttle door in question ten or more times prior to plaintiff's accident. Mr. Rosser further testified that on one occasion when he walked over the scuttle door, the door fell down into the subterranean pit. Mr. Rosser did not fall into the pit area but cut his ankle.

The question arises as to whether Mr. Rosser's knowledge of the scuttle door falling into the pit as he walked over it may be imputed to his employer, J.J. Barnes. A review of North Carolina case law shows that Mr. Rosser's knowledge may not be imputed to J.J. Barnes. First, knowledge of defects by an employee is not imputed to the employer where the employee fails to inform supervisory officials of such defects and where the employee does not hold a supervisory position himself. *Petty v. Cranston Print Works Co.*, 243 N.C. 292, 90 S.E.2d 717 (1956). This is the situation in the case at bar.

Secondly, the general rule is that a principal is chargeable with, and bound by, the knowledge of or notice of defects to his agent which are received while the agent is acting as such within the scope of his authority and in reference to a matter over which the agent's authority extends, even though the agent does not in fact inform his principal of such defects. *Greensboro Housing Authority v. Kirkpatrick & Associates, Inc.*, 56 N.C.App. 400, 289 S.E.2d 115 (1982). In the present case, however, any knowledge acquired by Rosser of the scuttle door falling into the pit as he walked over it is not imputable to J.J. Barnes under the general rule. There is no evidence in the record that the incident occurred when Rosser was acting within the course and scope of his employment. Furthermore, Rosser was not a supervisory employee or one engaged in safety concerns for J.J. Barnes. Thus, the matter was not one "over which his authority extended." *Id.* Therefore, this court finds that J.J. Barnes was not negligent in the case *sub judice* and did not proximately cause plaintiff's injuries.

## CONTRIBUTORY NEGLIGENCE

Defendant United States argues that if defendant is found to have been negligent, then plaintiff Mark Sexton's contributory negligence bars any recovery. Specifically, the United States argues that any defect in the scuttle door that existed at the time of the accident would have been an open, obvious danger and that plaintiff was contributorily negligent in failing to keep a proper lookout and avoiding the scuttle door area. The United States further argues that plaintiff had previously been warned of the hazards of the door and was negligent in failing to avoid the grate area after receiving such warnings.

This court finds no evidence exists that plaintiff was contributorily negligent in the case at bar. As explained above, the deficiencies in the scuttle door were latent and would not have been observed, even by an experienced welder who has been trained to observe his surroundings. In fact, the design deficiencies were so latent that plaintiff could not possibly have had any knowledge of them.

Plaintiff had been warned that the scuttle door was heavy and could be dropped when removed due to the weight of the door. His supervisors warned him not to use the door for ingress or egress from the pit area; his supervisors told him only to use the door to place pipes below into the pit. Plaintiff heeded his supervisors' warnings. He was not cautioned that the door had certain design defects and could fall when a person walked over it.

Larry Rosser, plaintiff's welding assistant, testified that one day when he walked over the scuttle door at issue, the door fell down into the pit. Mr. Rosser did not fall and only cut his ankle. He testified that he told no one of this incident, not even plaintiff, the person he was assisting. Thus, plaintiff had no knowledge that the door could fall when a person walked over it. He was not contributorily negligent in the case *sub judice*.

## GREAT AMERICAN'S LIEN

As explained above, at the time of trial, Great American had paid Workers'

Compensation benefits to plaintiff on behalf of plaintiff's employer, J.J. Barnes, in the amount of $265,636.63. Since this court has found that J.J. Barnes was not negligent in causing plaintiff's injuries on May 7, 1985, Great American is entitled to a lien on plaintiff Mark Sexton's total recovery from defendant in the amount of $265,636.63 until the lien is satisfied.

### LOSS OF CONSORTIUM DAMAGES

 Plaintiff Amelia Sexton (Huckenpahler) alleges that as a direct result of injuries sustained by plaintiff Mark Sexton, she suffered the loss of society, companionship, kindly offices, love, care, and affection of her husband, Mark Sexton, which resulted in the deterioration of their relationship and ultimate termination of their marriage. Plaintiffs were married at the time of Mark Sexton's accident, yet they subsequently divorced on February 17, 1989. Both parties have now remarried. This court must determine whether Amelia Sexton (Huckenpahler) should be allowed to recover for loss of consortium when she and the injured party, her former husband, are no longer married.

In *Nicholson v. Hugh Chatham Memorial Hospital, Inc.*, 300 N.C. 295, 266 S.E.2d 818 (1980), North Carolina recognized a cause of action belonging to both spouses for loss of consortium due to the negligence of third parties. The concept of "consortium" embraces two contrasting types of elements. Annot., 74 A.L.R.3d 805 (1990). The tangible elements include support and services provided by the other spouse, while intangible elements encompass such items as love, companionship, affection, society, sexual relations, comfort, and solace. *Id.*

A review of North Carolina law reveals, however, that there are no cases addressing the issue of loss of consortium damages where the spouses have divorced following the date of injury. Other circuits involving a divorce situation have allowed loss of consortium damages. *See Grasle Electric Co. v. Clark*, 525 P.2d 1081 (Alaska 1974) (loss of consortium damages awarded to wife where husband suffered a permanent lower-back injury and underwent a personality change which manifested itself in violent destructive tantrums directed at the wife, ultimately shattering the marital relationship); *Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W.2d 686 (Minn.1980) (loss of consortium damages awarded to wife where injuries to husband precipitated dissolution of marriage); *Amaru v. Stratton*, 209 N.J.Super. 1, 506 A.2d 1225 (1985) (loss of consortium damages awarded to wife where husband's injuries led to physical infirmity, inability to support family, and deterioration of the marital relationship); *Board of Commissioners v. Nevitt*, 448 N.E.2d 333 (Ind.App.1983) (loss of consortium damages in the amount of $100,000 awarded to wife where husband was injured in automobile accident three weeks after marriage and injuries led to dissolution of marriage three years later).

 This court finds that North Carolina would allow damages for loss of consortium to a party where the injuries to the party's spouse led to a dissolution of the marriage. The fact that the marital relationship resulted in a divorce would limit the *amount* of damages from the date of injury until the date of divorce.

In the case at bar, Amelia Sexton testified that she and Mark Sexton were married on January 31, 1971. She testified that Mark was her best friend and that they had had a wonderful marriage for fourteen years. She testified that he showed much affection and tenderness, that they had normal sexual relations, and that Mark had been a good provider for his family. Mrs. Sexton testified that she and Mark have two children, a son and a daughter, and that Mark had been a good father to his children.

Mrs. Sexton testified that following his accident on May 7, 1985, Mark underwent a personality change. He showed a great deal of anger and hostility towards her and their children. He became physically violent and abusive. Their sexual relationship was nonexistent for three years following the accident, and the couple had no social life. Mrs. Sexton testified that when she

could no longer deal with the drastic changes in Mark's personality, and she was very fearful for her and her children's physical safety, the couple separated and subsequently divorced on February 17, 1989.

Based on the above-stated facts, this court finds that Amelia Sexton Huckenpahler is entitled to recover from defendant United States loss of consortium damages in the total amount of $100,000. Amelia and Mark Sexton had enjoyed a happy life together and had a good marriage until the date of Mark's injuries. Following his accident, Mark underwent a drastic personality change which ultimately led to the destruction of his marriage. Amelia Sexton is entitled to recover for such damages.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over plaintiffs' claims pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

2. The Federal Tort Claims Act confers exclusive jurisdiction upon federal district courts over civil actions caused by the negligent or wrongful act or omission of any employee of the United States acting within the scope of his or her office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 1346(b).

3. The discretionary function exception, which is contained in 28 U.S.C. § 2680, does not apply in the present case and does not bar plaintiffs' claims.

4. Ellis–Walker, the general contractor, was an invitee of defendant United States during the construction project involved in this case at Womack Army Hospital. *Spivey v. Babcock & Wilcox Co.*, 264 N.C. 387, 388, 141 S.E.2d 808, 810 (1965). The government therefore owed Ellis–Walker a duty of due care under all of the circumstances. *Id.*

5. The employees of J.J. Barnes, including plaintiff Mark Sexton, were invitees in relation to Ellis–Walker during the

construction project at Womack Army Hospital. *Wellmon v. Hickory Construction Co., Inc.*, 88 N.C.App. 76, 80, 362 S.E.2d 591, 593 (1987).

6. The employees of J.J. Barnes, including plaintiff Mark Sexton, were invitees of defendant United States during the construction project at Womack Army Hospital. *Hood v. Queen City Coach Co.*, 249 N.C. 534, 540, 107 S.E.2d 154, 158 (1959).

7. Both the United States and Ellis–Walker owed to J.J. Barnes and its employees, including Mark Sexton, as invitees, the duty of ordinary care. *Langley v. R.J. Reynolds Tobacco Co.*, 92 N.C.App. 327, 329, 374 S.E.2d 443, 445 (1988). The duty of ordinary care involves keeping that portion of the premises designed for the invitee's use in a reasonably safe condition so as not to expose him unnecessarily to danger. *Wrenn v. Hillcrest Convalescent Home, Inc.*, 270 N.C. 447, 448, 154 S.E.2d 483, 484 (1967).

8. As explained in *Deaton v. Board of Trustees of Elon College*, 226 N.C. 433, 38 S.E.2d 561 (1946), the general rule in North Carolina is as follows:

> The owner is not responsible to an independent contractor for injuries from defects or dangers of which the contractor knew or should have known, "but if the defect or danger is hidden and known to the owner, and neither known to the contractor, nor such as he ought to know, it is the duty of the owner to warn the contractor, and if he does not do this, he is liable for resultant injury."

226 N.C. at 438, 38 S.E.2d at 565.

9. If a peril is hidden or unsafe conditions exist, and the landowner has actual or constructive knowledge of such conditions, he has a duty to give a warning to the affected invitees. *Long · v. Methodist Home for the Aged, Inc.*, 281 N.C. 137, 139, 187 S.E.2d 718, 720 (1972). The owner is not under a duty to warn an invitee of a danger or condition which is obvious, *Sellers v. Vereen*, 267 N.C. 307, 309, 148 S.E.2d 98, 100 (1966), or of which the invitee has equal or superior knowledge. *Wrenn v.*

*Hillcrest Convalescent Home, Inc.,* 270 N.C. at 448, 154 S.E.2d at 484.

10. In the present case, because the design deficiencies of the subject grate were latent and not obvious, and defendant United States had actual or constructive knowledge of such defects, defendant had a duty to warn Ellis–Walker and J.J. Barnes and their employees, including plaintiff, of such defects.

11. The design deficiencies were latent and could not have been discovered by Ellis–Walker or J.J. Barnes or their employees or agents, including plaintiff Mark Sexton.

12. Defendant United States was negligent and breached its duty of ordinary care when it failed to warn Ellis–Walker and J.J. Barnes and their employees, including plaintiff, of the defects in the subject scuttle door.

13. The design deficiencies in the scuttle door proximately caused the scuttle door to fall into the subterranean pit fourteen feet below when plaintiff Mark Sexton walked over the door on May 7, 1985. Defendant United States is therefore liable for plaintiff's injuries.

14. Ellis–Walker was not negligent and did not breach any duty of ordinary care owed by it to plaintiff Mark Sexton.

15. Because Ellis–Walker was not negligent, defendant United States is not entitled to indemnity or contribution from Ellis–Walker.

16. J.J. Barnes was not negligent and did not breach any duty owed by it to plaintiff Mark Sexton.

17. Plaintiff Mark Sexton was not contributorily negligent.

18. Knowledge of defects by an employee is not imputed to the employer where the employee fails to inform supervisory officials of such defects and where the employee does not hold a supervisory position himself. *Petty v. Cranston Print Works Co.,* 243 N.C. 292, 304, 90 S.E.2d 717, 725 (1956). Secondly, the general rule is that a principal is chargeable with, and bound by, the knowledge of or notice of defects to his agent which are received while the agent is acting as such within the scope of his authority and in reference to a matter over which the agent's authority extends, even though the agent does not in fact inform his principal of such defects. *Greensboro Housing Authority v. Kirkpatrick & Associates, Inc.,* 56 N.C.App. 400, 403, 289 S.E.2d 115, 117 (1982).

19. In the present case, any knowledge acquired by Rosser of the scuttle door falling into the pit as he walked over it may not be imputed to his employer, J.J. Barnes. First, Rosser failed to inform supervisory officials of this incident, and Rosser did not hold a supervisory position himself. Secondly, the general rule is not applicable because there is no evidence in the record that this incident occurred when Rosser was acting within the course and scope of his employment. Also, since Rosser was not a supervisory employee or one engaged in safety concerns for J.J. Barnes, the matter was not one "over which his authority extended." *Id.*

## CONCLUSION

Based on the above-stated Findings of Fact and Conclusions of Law, it is hereby ORDERED that judgment be entered in favor of plaintiff Mark Sexton as against defendant United States in the total amount of $972,218.00 and that judgment be entered in favor of plaintiff Amelia Sexton Huckenpahler as against defendant United States in the total amount of $100,000.00. It is ORDERED that plaintiffs be awarded interest at the prevailing rate from the date of judgment until paid. It is further ORDERED that Great American Insurance Company be GRANTED a lien against plaintiff Mark Sexton's judgment in the total amount of $265,636.63 until the lien is satisfied. It is further ORDERED that defendant United States have and recover nothing from third-party defendant Ellis–Walker.